PRESENT: All the Justices

WILLIAM J. HOWELL, ET AL.

OPINION BY
CHIEF JUSTICE DONALD W. LEMONS
July 22, 2016

v. Record No. 160784

TERENCE R. McAULIFFE, ET AL.

UPON A PETITION FOR WRITS OF MANDAMUS AND PROHIBITION

The dominant role in articulation of public policy in the Commonwealth of Virginia rests with the elected branches. The role of the judiciary is a restrained one. Ours is not to judge the advisability or wisdom of policy choices. The Executive and Legislative Branches are directly accountable to the electorate, and it is in those political venues that public policy should be shaped. From time to time, disagreements between these branches of government require interpretation of our statutes, the Constitution of Virginia, or the United States Constitution. Our proper role is to interpret law and not to express our opinion on policy. The case before us today is such a case.

Article II, Section 1 of the Constitution of Virginia sets out a general rule of law and then provides for an exception: "No person who has been convicted of a felony shall be *qualified* to vote *unless* his civil rights have been restored by the Governor or other appropriate authority." Va. Const. art. II, § 1 (emphasis added). On April 22, 2016, Governor Terence R. McAuliffe issued an Executive Order that inverts this rule-exception sequence. The practical effect of this Executive Order effectively reframes Article II, Section 1 to say: "No person who has been convicted of a felony shall be *disqualified* to vote *unless* the convicted felon is incarcerated or serving a sentence of supervised release."

Article I, Section 7 of the Constitution of Virginia provides: "That all power of suspending laws, or the execution of laws, by any authority, without consent of the

1

representatives of the people, is injurious to their rights, and ought not to be exercised." The major question before the Court is whether the Executive Order "suspends" a general principle of voter disqualification and replaces it with a new principle of voter qualification that has not received the "consent of the representatives of the people."

We answer this question against the backdrop of history. Never before have any of the prior 71 Virginia Governors issued a clemency order of any kind — including pardons, reprieves, commutations, and restoration orders — to a class of unnamed felons without regard for the nature of the crimes or any other individual circumstances relevant to the request. To be sure, no Governor of this Commonwealth, until now, has even suggested that such a power exists. And the only Governors who have seriously considered the question concluded that no such power exists.

In this case, Governor McAuliffe asserts that his clemency power in this matter is "absolute" under Article V, Section 12 of the Constitution of Virginia. J.A. at 1. We respectfully disagree. The clemency power may be broad, but it is not absolute. Deeply embedded in the Virginia legal tradition is "a cautious and incremental approach to any expansions of the executive power." Gallagher v. Commonwealth, 284 Va. 444, 451, 732 S.E.2d 22, 25 (2012). This tradition reflects our belief that the "concerns motivating the original framers in 1776 still survive in Virginia," including their skeptical view of "the unfettered exercise of executive power." Id.

In this proceeding, which invokes this Court's original jurisdiction, we also consider several other issues related to the issuance of the Executive Order, and whether writs of mandamus or prohibition lie against the Governor, the Secretary of the Commonwealth, the Virginia Department of Elections, the Commissioner of the Department of Elections, the State

2

Board of Elections, and the Chair, Vice Chair, and Secretary of the State Board of Elections, with respect to actions taken or to be taken in response to this Executive Order.

## I. FACTS AND PROCEEDINGS

Governor McAuliffe's Executive Order stated that it removed the political disabilities of approximately 206,000 Virginians who had been convicted of a felony but who had completed their sentences of incarceration and any periods of supervised release, including probation and parole. The civil rights restored by the Executive Order were the rights to vote, to hold public office, to serve on a jury, and to act as a notary public.[1] When Governor McAuliffe issued the Executive Order, he indicated that he would issue similar orders at the end of each month to restore the rights of Virginians who had been convicted of a felony but who had since completed their sentences of incarceration and supervised release. Governor McAuliffe issued such orders on May 31, 2016, and again on June 24, 2016.[2]

On May 23, 2016, Speaker of the Virginia House of Delegates William J. Howell, Majority Leader of the Virginia Senate Thomas Norment, Jr., and four other Virginia registered voters ("petitioners") filed a petition seeking writs of mandamus and prohibition in this Court against Governor McAuliffe, the Secretary of the Commonwealth, the Virginia Department of Elections, the Commissioner of the Department of Elections, and the State Board of Elections

_____

[1] The Executive Order states that it effects "the removal of the political disabilities consequent upon conviction of a felony *imposed by* Article II, Section 1 of the Constitution of Virginia," which under the language of the order includes the rights to vote, to hold public office, to serve on a jury, and to act as a notary public. The only political disability imposed by Article II, Section 1, however, is the loss of the right to vote. Given our holding, we need not address the impact, if any, of this discrepancy.

[2] We will refer to these orders, along with the April 22 Executive Order, collectively as the "Executive Orders." Our analysis of the lawfulness of the April 22 Executive Order applies with equal force to the May 31 and June 24 orders.

("respondents"). In their petition, they seek to cancel the voter registrations accomplished pursuant to the Executive Order, prevent further such registrations, and prohibit Governor McAuliffe from issuing additional executive orders categorically restoring the voting rights of felons who have completed their sentences. Petitioners assert that the Governor's Executive Order and any similar subsequent orders effectively nullify the Constitution of Virginia's general prohibition against voting by convicted felons who have completed sentences of incarceration and supervision. They contend this assertion of executive authority "defies the plain text of the Constitution, flouts the separation of powers, and has no precedent in the annals of Virginia history."

Petitioners ask this Court to issue a writ of mandamus to compel Commissioner of the Virginia Department of Elections Edgardo Cortés to fulfill his duties under Code § 24.2-404(A)(2), (A)(4), and (A)(6), by removing from the record of registered voters any felon who has registered pursuant to the challenged executive orders, returning those persons to the list of individuals prohibited from voting, and refusing to register any new voters under the orders. Also, petitioners seek to compel Chairman of the Virginia Board of Elections James Alcorn, Vice Chairman of the Virginia Board of Elections Clara Bell Wheeler, and Secretary of the Virginia Board of Elections Singleton McAllister to fulfill their duties under Code § 24.2-404(C) by instituting procedures to ensure that Commissioner Cortés complies with any order we may issue.

Petitioners further ask that we command Secretary of the Commonwealth Kelly Thomasson to comply with her duty under Code § 24.2-404(A)(9) and Code § 53.1-231.1 and delete or omit from the records of felons who have had their political rights restored any person whose rights were restored pursuant to one of the challenged executive orders. Additionally,

4

petitioners ask that we command Governor McAuliffe to fulfill his constitutional duty to take care that the laws prohibiting felons from voting are faithfully executed and that his subordinates comply with any order we issue.

With regard to their requested writs of prohibition, petitioners ask that we prevent Governor McAuliffe from issuing further executive orders restoring civil rights to felons on a categorical, as opposed to an individual, basis. Lastly, petitioners seek to forestall Commissioner Cortés, Chairman Alcorn, Vice Chairman Wheeler, Secretary McAllister, and Secretary Thomasson from facilitating the further registration of felons pursuant to any of the allegedly unconstitutional orders. Petitioners also requested this Court expedite consideration of their petition.

Respondents filed a response to the petition for writs of mandamus and prohibition and a motion to dismiss. In their motion to dismiss, respondents assert that petitioners lack standing, have failed to join necessary parties, and have failed to show the Governor lacked the lawful authority to issue the orders in question. Respondents also contend that petitioners have failed to state a claim for mandamus or prohibition and that the Governor's actions were constitutional under the plain language of Article V, Section 12 of the Constitution of Virginia.

We granted the motion for expedited consideration and heard oral argument in this matter on July 19, 2016.

## II. ANALYSIS
### A. Standing

Whether petitioners have standing to seek mandamus and prohibition relief upon the allegations in their petition, as raised by respondents' motion to dismiss, is a threshold issue and a question of law. See Virginia Marine Res. Comm'n v. Clark, 281 Va. 679, 686-87, 709 S.E.2d 150, 154-55 (2011). In determining whether petitioners have standing to maintain this action, we

5

consider the factual allegations as true. See id. It is incumbent on petitioners to allege facts sufficient to demonstrate standing. See Friends of the Rappahannock v. Caroline Cty. Bd. of Supervisors, 286 Va. 38, 50, 743 S.E.2d 132, 138 (2013).

Standing concerns itself with the characteristics of the individuals who file suit and their interest in the subject matter of the case. Westlake Props. v. Westlake Pointe Prop. Owners Ass'n, 273 Va. 107, 120, 639 S.E.2d 257, 265 (2007). Broadly speaking, standing can be established if a party alleges he or she has a "legal interest" that has been harmed by another's actions. See Radin v. Crestar Bank, 249 Va. 440, 442, 457 S.E.2d 65, 66 (1995). As a general rule, without "a statutory right, a citizen or taxpayer does not have standing to seek mandamus relief . . . unless he [or she] can demonstrate a direct interest, pecuniary or otherwise, in the outcome of the controversy that is separate and distinct from the interest of the public at large." Goldman v. Landsidle, 262 Va. 364, 373, 552 S.E.2d 67, 72 (2001). These general requirements of standing apply to applications for writs of mandamus and prohibition. See Moreau v. Fuller, 276 Va. 127, 134-35, 661 S.E.2d 841, 845 (2008).

Here, petitioners base their alleged standing on their status as "qualified voters who live and are registered to vote in the Commonwealth, and who plan to vote in the 2016 General Election." Petitioners allege respondents have directly injured them by allowing the registration of unqualified voters pursuant to the "unconstitutional" Executive Order, thereby diluting their legal votes and infringing their right of suffrage guaranteed under Article I, Section 6 of the Constitution of Virginia. Article II, Section 1 sets forth the qualifications for voters and requires that each voter "be a citizen of the United States," "be eighteen years of age," and be "a resident of the Commonwealth and of the precinct where he votes." Article II, Section 1 further provides that "[n]o person who has been convicted of a felony shall be qualified to vote unless his civil

6

rights have been restored by the Governor or other appropriate authority."  See also Code § 24.2-101.

Petitioners contend that the Executive Order is "unconstitutional and does not restore the political rights of any convicted felon."  Petitioners also allege respondents' "ongoing, coordinated efforts to register unqualified voters" have not only diluted petitioners' votes, but have also "created an illegitimate electorate, and threatened the legitimacy of the November elections."  Petitioners further allege that the Governor's Executive Order has unlawfully enfranchised approximately 206,000 felons.[3]

In turn, respondents assert that petitioners' status as qualified voters does not give them a direct interest in the proceedings separate from the public at large and that their claimed injuries are like the generalized grievances this Court has ruled do not establish standing.  Respondents further contend that petitioners lack standing because Code § 24.2-431 is petitioners' exclusive remedy for challenging the registration of ineligible voters.

We begin our analysis with the observation that this case has been brought by Virginia citizens against the Governor of Virginia and other state officials in the Supreme Court of Virginia, alleging violations of the Constitution of Virginia.  Accordingly, Virginia law, not federal law, governs every aspect of our decision.  The parties and amici present a battery of federal citations addressing the standing doctrine applied to the case-or-controversy provision of Article III of the United States Constitution.  The standing issue in our case, however, implicates the capacity of Virginia citizens, who have a legal right to vote, to challenge an executive action which allegedly allows for the registration of unqualified voters.

_____

[3] Respondents acknowledge, as of June 20, 2016, pursuant to the Governor's Executive Orders, 7,620 felons have registered to vote in the 2016 General Election.  See Resp. to Verified Pet. at 2.

7

Under our precedent, a litigant has standing if he has "a sufficient interest in the subject matter of the case so that the parties will be actual adversaries and the issues will be fully and faithfully developed." Cupp v. Board of Supervisors, 227 Va. 580, 589, 318 S.E.2d 407, 411 (1984). We have never applied this principle to a constitutional claim by voters alleging that an executive action diluted their voting strength in violation of the anti-suspension provision of Article I, Section 7 of the Constitution of Virginia. However, we have recognized that Virginia citizens have standing to assert vote-dilution claims in analogous circumstances.

In Wilkins v. West, 264 Va. 447, 460, 571 S.E.2d 100, 107 (2002), we addressed whether voters had standing to challenge electoral districts allegedly drawn in violation of the compactness and contiguity requirements of Article II, Section 6 of the Constitution of Virginia. We determined residents of districts that do not meet compactness and contiguity requirements are "directly affected by the legislature's failure to comply with the Constitution of Virginia." Id. The unconstitutional configuration of a district gives rise to an "inference of particularized injury" for residents of that district. Id. at 459-60, 571 S.E.2d at 107. We held an individual's residency in an affected district was sufficient to confer standing to challenge non-compliance with a constitutional provision in "the voting context" without "further proof of a personalized injury." Id. at 460, 571 S.E.2d at 107 (quoting United States v. Hays, 515 U.S. 737, 745 (1995)).[4]

---

[4] Our cases have also assumed standing existed in cases involving allegations of unlawful vote dilution. See, e.g., Wilkins v. Davis, 205 Va. 803, 804, 810, 139 S.E.2d 849, 853-54 (1965) (upholding a challenge to a redistricting scheme by a "duly qualified voter and taxpayer" because the districts did not contain "as nearly as practicable an equal number of inhabitants"); Davis v. Dusch, 205 Va. 676, 677, 139 S.E.2d 25, 25-26 (1964) (allowing a suit by city residents to compel the city council to reapportion the seats on the city council); Brown v. Saunders, 159 Va. 28, 31-32, 46, 166 S.E. 105, 105, 111 (1932) (upholding a challenge to a redistricting scheme by

8

Applying the principles enunciated in <u>Wilkins</u>, we conclude that each petitioner, as a Virginia registered voter planning to vote in the 2016 General Election, is directly affected by the allegedly unconstitutional expansion of the statewide electorate and has standing to challenge the Executive Order and respondents' registration of allegedly unqualified voters. Like the complainants in <u>Wilkins</u> who were directly affected in district-wide elections by the legislature's alleged failure to comply with the Constitution of Virginia, petitioners have alleged that they will be directly affected in a statewide general election by respondents' alleged failure to comply with the Constitution of Virginia. Both scenarios arise in "the voting context," <u>id.</u>, and both implicate the rights of qualified resident voters.[5]

We disagree with respondents' view that <u>Wilkins</u> should be sidelined because it included a claim that certain districts were racially gerrymandered. That is true, but beside the point. As previously noted, <u>Wilkins</u> also involved a freestanding constitutional claim, conceptually distinct

---

a candidate for the United States House of Representatives because the "inequality" in numbers between the districts was "obvious, indisputable, and excessive").

[5] Our dissenting colleagues rely on <u>Goldman v. Landsidle</u>, 262 Va. 364, 552 S.E.2d 67 (2001), a taxpayer standing case. In <u>Goldman</u>, taxpayers filed suit seeking a judicial order requiring the state comptroller to ensure "that certain public officials actually have incurred office expenses before disbursing state funds to them for those expenses." <u>Id.</u> at 367, 552 S.E.2d at 68-69. We held that citizens *qua* taxpayers, absent express statutory authorization, do not have "taxpayer standing" to seek judicial review of the state comptroller's official actions. <u>Id.</u> at 373-74, 552 S.E.2d at 72-73. Nothing in <u>Goldman</u> addressed standing principles applicable to a vote-dilution claim. <u>Wilkins</u>, decided a year later, did not mention <u>Goldman</u> because it had no bearing on a constitutional claim of vote dilution caused "by the legislature's failure to comply with the Constitution of Virginia." <u>Wilkins</u>, 264 Va. at 460, 571 S.E.2d at 107; <u>accord</u> <u>FEC v. Akins</u>, 524 U.S. 11, 22-23 (1998) (distinguishing "taxpayer standing" from "voter standing" and stating that the "legal logic" critical to the former is "beside the point" in the latter).

We also find unpersuasive the dissent's reliance on <u>Cherrie v. Virginia Health Servs.</u>, 292 Va. ___, ___ S.E.2d ___ (2016). The concept of *statutory* standing addresses only whether a litigant has a legally cognizable right of action to assert a statutory claim. <u>Id.</u> at ___, ___ S.E.2d at ___. The presence or absence of a statutory right of action has no impact on the question whether a litigant has standing to assert a constitutional claim of vote dilution.

from racial gerrymandering, alleging a violation of the compactness and contiguity requirements of Article II, Section 6. We found that all voters residing within the affected districts had standing to assert their claims. Here, petitioners complain that the Governor's Executive Order adds 206,000 unqualified voters into the statewide electorate. The underlying interest protected by our standing analysis in Wilkins — the right of Virginia voters to seek judicial review of unconstitutional manipulations of the electorate — parallels the interest asserted by petitioners in this case. The specific manipulation is different, but the standing analysis is the same. As three former Attorneys General argue in their amicus brief, this case

> presents a textbook claim of vote dilution. When a pool of voters is made larger, each vote carries less weight: a vote is worth more if there are 10 other voters than if there are 100,000 other voters. Here, the Governor has unlawfully allowed felons to register on a global basis. That action has added (and will continue to add) thousands of citizens to the pool of eligible voters which, in turn, weakens the strength of those Virginians who were already eligible to cast a ballot.
>
> . . . .
>
> Governor McAuliffe's executive order has unlawfully increased the eligible voting population in electoral districts across the Commonwealth. There are now individuals residing in Petitioners' districts who will be permitted to vote even though they do not hold that right under the Constitution. The Governor's action, in other words, unconstitutionally inflates the size of the electorate both in those districts and across the Commonwealth (thus diluting Petitioners' votes in statewide contests).

Former Attorneys General Amicus Br. in Support of Petitioners at 27-28 (citations omitted).

We acknowledge the assertion that, in vote-dilution cases, "the concept of 'packing' requires a comparison," post at 39, and that no such comparison exists in this case. No authorities are cited for this proposition, however, and we are aware of none. At any rate, the relevant comparison here is between a statewide electorate packed with 206,000 disqualified voters and one without them. Every qualified voter (though not every member of the general public) suffers the same vote-dilution injury. To rule otherwise would be to hold that unlawful

10

vote dilution occurring within a geographic subset of a state triggers standing, but an equally unlawful vote dilution of far greater proportions, one affecting the entire state, does not.

That said, we emphasize that our standing conclusion rests heavily on the unprecedented circumstances of this case. The sweeping scope of the Executive Orders precludes any assertion that its vote-dilution effect should be dismissed as de minimis. The strength of this point is compounded by the fact that the Executive Orders identify none of the 206,000 felons by name, and, to date, Governor McAuliffe has withheld "the administration's list of felons whose rights were restored" under the Executive Orders. Virginia Freedom of Information Advisory Council, Advisory Op. AO-01-16 (July 11, 2016) (citing Code §§ 2.2-3705.7 and 24.2-404(B)); see Code § 30-179(1) (authorizing the Virginia Freedom of Information Advisory Council to issue advisory opinions).

In short, this case involves an allegation by Virginia citizens that their votes have been diluted by the unconstitutional addition of 206,000 disqualified voters to the statewide electorate. Like the voters in Wilkins, petitioners in this case have standing to assert that their voting rights have been harmed by an allegedly unconstitutional manipulation of the electorate. We thus have authority to decide this dispute.[6] To not do so would be an inexcusable failure on our part to fulfill our duty to interpret and apply Virginia law in a case where the parties are "actual adversaries" and the legal issues have been "fully and faithfully developed." Cupp, 227 Va. at 589, 318 S.E.2d at 411. This is not a case, therefore, in which we are invited to answer "abstract

---

[6] In addition to claiming standing as qualified voters, Speaker Howell and Senator Norment allege they have been injured in their capacity as members of the General Assembly because the Executive Order "trenches upon the General Assembly's role in initiating constitutional amendments." Senator Norment also asserts standing in his capacity as a candidate who plans to seek re-election in 2019 and contends he will be injured if he is required to compete for re-election in an "invalidly constituted electorate." Given our holding, we need not address these alternative grounds for establishing standing.

questions" that may be "interesting and important to the public" but lack any real "errors injuriously affecting" the complaining litigants. Nicholas v. Lawrence, 161 Va. 589, 593, 171 S.E. 673, 674 (1933).[7]

Finally, we find no merit in respondents' argument that Code § 24.2-431 provides the exclusive remedy for petitioners' allegations and that recognizing their standing in this action would improperly circumvent Code § 24.2-431. Code § 24.2-431 allows three qualified voters to file a petition in the circuit court of the county or city in which they are registered, stating their

_____

[7] Justice Powell's dissent relies on federal cases to support the assertion that petitioners' standing would not be recognized in a federal court under analogous circumstances. Even if we consider these authorities controlling, see supra at 7, we would respectfully disagree with her interpretation of them. The principal case relied upon is Evenwel v. Abbott, 578 U.S. ___, 136 S. Ct. 1120, 1123 (2016), which held a State could "draw its legislative districts based on total population" rather than voter-eligible population. The holding did not address, much less turn upon, the doctrine of standing. Indeed, if the plaintiffs in Evenwel did not have standing, the Court would have never reached the merits of their constitutional claim. The only mention of "standing" in the opinion was a footnote explaining why it was *not* an issue. See id. at ___ n.12, 136 S. Ct. at 1131 n.12 (observing that voters could establish standing by asserting their "votes were diluted" but that the "Court has not considered standing of nonvoters," a question that was "unlikely ever to arise given the ease of finding voters to serve as plaintiffs").

For this reason, we are unpersuaded by Justice Powell's view that Evenwel narrowed existing vote-dilution principles applicable under federal standing law — which has traditionally recognized that "the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." Purcell v. Gonzalez, 549 U.S. 1, 4 (2006) (per curiam) (quoting Reynolds v. Sims, 377 U.S. 533, 555 (1964)); Duncan v. Coffee Cty., 69 F.3d 88, 94 n.3 (6th Cir. 1995) (observing that, "[n]aturally, any time voters are added to the rolls . . . those already on the rolls have had their votes diluted"); see also Department of Commerce v. United States House of Representatives, 525 U.S. 316, 331-32 (1999) (finding standing because "[w]ith one fewer Representative, Indiana residents' votes will be diluted"); Michel v. Anderson, 14 F.3d 623, 626 (D.C. Cir. 1994) (finding standing because "voters have standing to challenge practices that are claimed to dilute their vote, such as being placed in a voting district that is significantly more populous than others"), rejected on other grounds by Raines v. Byrd, 521 U.S. 811 (1997) (rejecting standing for members of Congress based on the loss of political power); accord Akins, 524 U.S. at 21 (finding that *all* voters have constitutional standing to file suit alleging that the FEC withheld public information that "would help them (and others to whom they would communicate it) to evaluate candidates for public office").

12

objections to the registration of any person whose name is on the registration records for their city or county. Respondents correctly note that when "a statute creates a right and provides a remedy for the vindication of that right, then that remedy is exclusive unless the statute says otherwise." Concerned Taxpayers of Brunswick Cty. v. County of Brunswick, 249 Va. 320, 330, 455 S.E.2d 712, 717 (1995) (citations omitted). This rule, however, does not apply here. Although statutory rights may create a legal interest giving rise to statutory standing, petitioners' interest in this case is not created exclusively by statute. Petitioners allege the Executive Order and respondents' implementation of it are unconstitutional and have impaired their voting rights. Accordingly, petitioners' standing in this case is not dependent upon Code § 24.2-431.

### B. Necessary Parties

In their motion to dismiss and response brief, respondents contend petitioners have failed to join necessary parties. They assert that the persons whose political disabilities the Governor has removed are necessary parties because petitioners seek to impair or impede their rights by re-imposing the political disabilities. Absent a statutory requirement, the necessary party doctrine does not implicate subject matter jurisdiction. Michael E. Siska Revocable Tr. v. Milestone Dev., LLC, 282 Va. 169, 173-81, 715 S.E.2d 21, 23-27 (2011).

A court can choose to proceed without a necessary party if (1) it is "practically impossible" to join a necessary party and the missing party is represented by other parties who have the same interests; (2) the missing party's interests are separable from those of the present parties, so the court can rule without prejudicing the missing party; or (3) a necessary party cannot be made a party, but the court determines that the party is not indispensable. Marble Techs., Inc. v. Mallon, 290 Va. 27, 32, 773 S.E.2d 155, 157 (2015) (quoting Siska, 282 Va. at 176, 179-80, 715 S.E.2d at 25, 27); Rule 3:12(c). In this case, it would be "practically

impossible" to join the 206,000 convicted felons whose political disabilities were restored by the Executive Orders. Further, these individuals are ably represented by respondents. Accordingly, we deny the respondents' motion to dismiss on this ground.

### C. Constitutionality of the Executive Order

#### 1.

Relying on his clemency power under Article V, Section 12 of the Constitution of Virginia, Governor McAuliffe's Executive Order sought "to restore the political rights of any persons disqualified by Article II, Section 1." J.A. at 1. The voter-disqualification provision in Article II, Section 1 of the Constitution of Virginia provides: "No person who has been convicted of a felony shall be qualified to vote unless his civil rights have been restored by the Governor or other appropriate authority." Felons may request that their civil rights be restored, and Article II, Section 1 grants the Governor the power to consider and act on those requests.

Scores of restoration orders have been issued for more than a century to specific felons who requested that their civil rights be restored. Never before, however, have any of the prior 71 Virginia Governors issued a sua sponte clemency order of any kind, whether to restore civil rights or grant a pardon, to an entire class of unnamed felons without regard for the nature of the crimes or any other individual circumstances relevant to the request. What is more, we are aware of no point in the history of the Commonwealth that any Governor has even asserted the power to issue such an order.

This issue is not a new one. As recently as 2010, Governor Tim Kaine openly expressed his disagreement "with the current policy embodied in the Constitution of Virginia that a felony conviction automatically leads to permanent disenfranchisement." J.A. at 4. Shortly before the end of his term in office, Governor Kaine was asked to exercise his "executive power . . . to restore voting rights to an unknown number of unnamed individuals who have not applied to

have their voting rights restored." Id. at 3. In response, Governor Kaine undertook "a very careful review of [this] proposal." Id.

In a letter issued on his behalf by Mark Rubin, Counselor to the Governor, Governor Kaine concluded that the voter-disqualification provision did not authorize a "blanket use" of the restoration power to "benefit unnamed individuals." Id. The better understanding of the provision, he concluded, was that the power could be exercised only "in particular cases to named individuals for whom a specific grant of executive clemency is sought." Id. at 4. Consequently, "[a] blanket order restoring the voting rights of everyone would be a rewrite of the law rather than a contemplated use of the executive clemency powers." Id. The very "notion that the Constitution of the Commonwealth could be rewritten via executive order is troubling." Id. Citing his "pledge to uphold the Constitution," Governor Kaine refused to "issue a blanket restoration of rights to unnamed individuals" on a categorical basis. Id.[8]

Because Governor Kaine's view explains the uniform practice of all Governors to date, the political process has been steadily churning on this issue for decades. Since the 1980s, unsuccessful attempts have been made to amend the Constitution of Virginia on the subject of restoration of civil rights. At least 69 resolutions and bills addressing categorical exclusions to the voter-disqualification provision in Article II, Section 1, were offered during each of the legislative sessions from 2004 through 2016, including one continued to the 2017 legislative

_____

[8] In 2013, a bipartisan committee appointed by Attorney General Kenneth Cuccinelli also concluded a Virginia Governor "cannot institute by executive order an automatic, self-executing restoration of rights," J.A. at 7, and may remove political disabilities only after "individualized consideration and individualized grant of clemency," id. at 8.

session — and all have failed to pass the General Assembly. Nearly half of these failed resolutions and bills addressed the categorical basis of the Governor's order.[9]

Representative of these failed efforts was H.J. Res. 119 (2016), which proposed to replace the current conditional language of Article II, Section 1 ("unless his civil rights have been restored by the Governor or other appropriate authority") with the following new conditional language: "unless he has served his full sentence and has been released back to civil society." None of these efforts would have been necessary if the power sought had always existed, unnoticed and unclaimed, since 1870, as Governor McAuliffe contends.

We recognize that these observations do not preclude us from recognizing a novel executive power that no prior Governor ever believed existed. "Long settled and established practice" has never been considered to be "binding on the judicial department." Pocket Veto Case, 279 U.S. 655, 689 (1929). And we do not consider it to be binding upon us. We do, however, consider it to be highly persuasive. As Justice Holmes so succinctly put it, "a page of history is worth a volume of logic." New York Tr. Co. v. Eisner, 256 U.S. 345, 349 (1921). When government actors have adopted a "practical construction" of a constitutional provision that "has been acquiesced in for a considerable period, considerations in favor of adhering to this construction sometimes present themselves to the courts with a plausibility and force which . . . is not easy to resist," especially "where a particular construction has been generally accepted as

_____

[9] See H.J. Res. 92 (2016); H.J. Res. 604 (2015); H.J. Res. 621 (2015); H.J. Res. 627 (2015); H.J. Res. 628 (2015); S.J. Res. 293 (2015); H.J. Res. 70 (2014); H.J. Res. 107 (2014); H.J. Res. 563 (2013); H.J. Res. 603 (2013); H.J. Res. 664 (2013); H.J. Res. 17 (2012); H.J. Res. 125 (2012); H.J. Res. 497 (2011); H.J. Res. 524 (2011); H.J. Res. 610 (2011); H.J. Res. 634 (2011); H.J. Res. 16 (2010); H.J. Res. 42 (2010); H.J. Res. 70 (2010); H.J. Res. 116 (2010); H.J. Res. 182 (2009); H.J. Res. 623 (2009); H.J. Res. 664 (2009); H.J. Res. 677 (2009); H.J. Res. 182 (2008); H.J. Res. 29 (2007); H.J. Res. 680 (2007); S.J. Res. 15 (2007); H.J. Res. 29 (2006); S.J. Res. 15 (2006).

correct." Thomas M. Cooley, A Treatise on the Constitutional Limitations Which Rest upon the Legislative Power of the States 102 (Victor H. Lane ed., 7th ed. 1903).

That observation is particularly strong when courts review the scope of executive power. In that context, the "longstanding 'practice of the government,'" NLRB v. Canning, ___ U.S. ___, ___, 134 S. Ct. 2550, 2560 (2014) (quoting McCulloch v. Maryland, 17 U.S. (4 Wheat.) 316, 401 (1819)), has traditionally played an important role in informing "our determination of 'what the law is,'" id. (quoting Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177 (1803)). The "practical construction" given by the executive department "through a long course of years" should be treated as "a consideration of *great weight* in a proper interpretation" of the scope of executive power. Pocket Veto Case, 279 U.S. at 688-89 (emphasis added).

This common-sense inference resonates even more strongly when governmental actors, contrary to the natural tendency of those with concentrated power, unwaveringly utilize a "practical construction," id. at 688, which *limits* the scope of their power. "[J]ust as established practice may shed light on the extent of power conveyed," it is equally true that "the want of assertion of power by those who presumably would be alert to exercise it, is equally significant in determining whether such power was actually conferred." BankAmerica Corp. v. United States, 462 U.S. 122, 131 (1983) (citation omitted). As Justice Frankfurter reasoned, "a consistent and unexplained failure to exercise power not obviously conferred by legislation may be equally persuasive that the power claimed was never conferred." United States v. American Union Transp., Inc., 327 U.S. 437, 458-59 (1946) (Frankfurter, J., dissenting); accord Utility Air Regulatory Grp. v. EPA, 573 U.S. ___, ___, 134 S. Ct. 2427, 2444 (2014) ("When an agency claims to discover in a long-extant statute an unheralded power to regulate . . . , we typically greet its announcement with a measure of skepticism.").

As applied to the executive power of a Virginia Governor, we found this interpretative inference persuasive in Lewis v. Whittle, 77 Va. 415 (1883). That case addressed whether a Governor had the power to remove individuals from the board of visitors of a public college. Three decades of "successive governors" had interpreted the executive power to preclude this power. Id. at 420-22. The executive power at issue received this "construction at the hands of successive governors, who, during many successive terms of office" had consistently interpreted their power to be limited. Id. at 422. Though not dispositive, we gave considerable weight to this construction and found the aberrant interpretation offered by the then-current Governor was an "ingeniously disguised" effort to create, through a "strained construction" of the governing statutes, an executive power that had no precedent in law or practice. Id.

Lewis counsels that we accord interpretive respect to the unbroken historical record of the last 71 Governors of Virginia. None of them claimed the executive power under Article V, Section 12 to grant reprieves, pardons, and commutations, and to remove political disabilities was *absolute*, subject to no restraining principle of law whatsoever. Governor McAuliffe's contention to the contrary is unprecedented. All prior Governors exercised their clemency powers — including pardons, reprieves, commutations, and restorations— on an individualized case-by-case basis taking into account the specific circumstances of each.[10] The self-restraint of

_____

[10] The Governor contends we should not infer that this unbroken history of disuse implies the absence of power, but instead we should look at examples of broad grants of amnesty and pardon by United States Presidents. These examples include an impressive list beginning with President Washington's pardon of participants in the 1791 Whiskey Rebellion and ending with President Carter's pardon of Vietnam War draft dodgers. See Respondents' Br. at 42-43 & n.153. We find this analogy unpersuasive. If examples of categorical federal pardons — dating back to George Washington — supported the argument for categorical restoration orders under Virginia law, then why have 71 Virginia governors, over the course of 240 years, ignored this analogical basis for doing the same with respect to restoration orders — or for that matter, any order of pardon, reprieve, or commutation? We believe the reason why is because the federal

these Governors paralleled our "cautious and incremental approach to any expansions of the

executive power" and remained faithful to the belief that the "concerns motivating the original

framers in 1776 still survive in Virginia," including their skeptical view of "the unfettered

exercise of executive power."  Gallagher, 284 Va. at 451, 732 S.E.2d at 25.

2.

Governor McAuliffe does not dispute the historical record.  Instead, he argues that the

literal text of Article V, Section 12 clearly shows that his 71 predecessors failed to appreciate the

unlimited nature of their executive powers in such matters.  From reading only the constitutional

text, the Governor contends, we should conclude that it "plainly authorizes the group restoration-

of-rights at issue here."  Resp. to Verified Pet. at 2.  He also sees in the same provision the

implicit authority of a Virginia Governor to issue "blanket" class-based pardons and amnesties

similar to those issued by U.S. Presidents.  Id. at 43-44.

_____

pardon power is quite different from the Virginia restoration power.  The United States
Constitution does not provide, as a general rule of law, that felons are per se disqualified from
voting, as does Article II, Section 1 of the Constitution of Virginia.  Nor does the United States
Constitution include an explicit anti-suspension provision similar to Article 1, Section 7 of the
Constitution of Virginia, which strengthens the barriers against executive assertions of absolute
power in defiance of generally applicable rules of law.  These two provisions and our analysis of
how they work in tandem applied to the facts of this case are noticeably missing from the federal
context.

These dissimilarities stem, in part, from the fact that the first Constitution of Virginia was
drafted in the midst of a War of Independence in opposition to a British monarch perceived as a
tyrant.  In contrast, the United States Constitution was drafted a decade later against a backdrop
of years of governmental dysfunction due, in part, to the lack of a vigorous executive under the
Articles of Confederation.  In this respect, the constitutional seeds were thus planted in different
soil.  The clemency power of a Virginia Governor has historically been more circumscribed than
the analogous powers of a United States President.  In 1776, the Constitution of Virginia
required the Governor to first consult with the Council of State before issuing a pardon and
forbade any executive pardon contrary to laws enacted by the legislature. Va. Const. § 9 (1776).
The Constitution of Virginia later imposed a reporting requirement.  See Va. Const. art. V, § 12.
Accordingly, federal practice with respect to the issuance of categorical, class-based pardons has
no persuasive force with respect to the more limited power accorded to a Virginia Governor.

19

We find this textual argument to be overstated at best. The assertion that a Virginia Governor has the power to grant blanket, group pardons is irreconcilable with the specific requirement in Article V, Section 12 that the Governor communicate to the General Assembly the "particulars of every case" and state his "reasons" for each pardon. This requirement implies a specificity and particularity wholly lacking in a blanket, group pardon of a host of unnamed and, to some extent, still unknown number of convicted felons. No such requirement exists in the United States Constitution, and thus, the text of Article V, Section 12 of the Constitution of Virginia undermines the Governor's argument by analogy. See also supra note 10.

Governor McAuliffe fairly notes, however, that the particularized reporting requirement in Article V, Section 12 does not specifically mention the removal of political disabilities. From that omission, he contends, we should at least infer that the absence of a particularized reporting requirement for restoration orders implies the presence of an unlimited (or, to quote the Governor, an "absolute") power to issue blanket, group restoration orders even if we were skeptical of doing so for blanket, group pardons.

In response, petitioners point out that the reporting requirement was added to the Constitution of Virginia in 1851, prior to the adoption of the "removal of political disabilities" provision in 1870 — thus leaving open the inference that the reporting requirement would be naturally understood to apply *in pari materia* to all acts of executive clemency, including restoration orders.[11] This inference, they contend, gains strength from the absence of any

---

[11] Recent practice lends support to this inference. See Governor Terence R. McAuliffe, List of Pardons, Commutations, Reprieves and Other Forms of Clemency, S. Doc. No. 2, at 16-495 (2014) (reporting individualized orders of "Restoration of Rights"); id. S. Doc. No. 2, at 5-649 (2015) (same); id. S. Doc. No. 2, at 23-366 (2016) (same). Likewise, the practice of Virginia Governors over 100 years ago also supports this inference. See, e.g., Governor William Hodges Mann, A List of Pardons, Commutations, Respites and Remission of Fines and Reasons

20

suggestion that the reporting requirement was meant to alter the shared nature of the various clemency powers. In any event, petitioners conclude, even if no reporting requirement did apply to restoration orders, it is a simply a bridge too far to infer that the absence of a mere reporting requirement constitutes an express endorsement of the Governor's claim of absolute power to issue blanket, group restoration orders. That is particularly true, petitioners add, if he has no such authority with respect to every other act of clemency within his authority.

On a second line of argument, petitioners contend that an equally plausible inference is that, even if the Governor need not report the particulars of each removal of political disabilities, the nature of that power is no different than all the other clemency powers, each of which requires an individualized consideration. The Governor provides no explanation for why the power to remove political disabilities alone should be any different in its essential character from all the other clemency powers, such as the pardon power, the power to remit fines, or the power to commute capital punishment — particularly when all of those clemency powers, grouped together in the same clause, have by unanimous historical practice involved individualized determinations.

The plausibility of these competing inferences undermines Governor McAuliffe's argument that the literal text of Article V, Section 12 "plainly" acknowledges his newly-found power to issue a "group restoration-of-rights" executive order, Resp. to Verified Pet. at 2, to a class of unnamed felons, numbering approximately 206,000, without any consideration of their particular circumstances. We thus reject the Governor's contention that a faithful reading of the

_____

Therefor, H. Doc. No. 9, at 43 (1912) (listing individualized orders for removal of political disabilities).

21

text of Article V, Section 12 endorses his assertion of absolute power to issue clemency orders that his 71 predecessors thought to be of dubious provenance.

3.

As strong as it is, we need not rely solely on the interpretative inference that arises from the uninterrupted disuse of governmental power. Governor McAuliffe's assertion of "absolute" power to issue his executive order, J.A. at 1, runs afoul of the separation-of-powers principle protected by Article I, Section 7 of the Constitution of Virginia. That provision declares: "That all power of suspending laws, or the execution of laws, by any authority, without consent of the representatives of the people, is injurious to their rights, and ought not to be exercised." Though somewhat obscure to modern readers, this provision was considered by the Framers of our Commonwealth as an essential pillar of a constitutional republic.

The anti-suspension provision first appeared as Section 7 of the 1776 Virginia Declaration of Rights, the drafting of which has been commonly credited to George Mason.[12] Years later, when the United States Constitution was drafted and submitted to the States for

---

[12] Although George Mason's first draft did not include the anti-suspension provision, it appeared in the committee draft without any clear indication of whether George Mason or some other member of the committee added it, and the provision was unanimously adopted by the convention in that form. See 1 A.E. Dick Howard, Commentaries on the Constitution of Virginia 90-91 (1974); 1 Papers of George Mason 1725-1792, at 276-78, 283-85, 288 (Robert A. Rutland ed., 1970).

Other states included similar constitutional provisions. The Delaware Declaration of Rights and Fundamental Rules of 1776 provided "[t]hat no Power of suspending Laws, or the Execution of Laws, ought to be exercised unless by the Legislature." 4 The Founders' Constitution 124 (Philip B. Kurland & Ralph Lerner eds., 1987). The Vermont Constitution of 1786 also declared "[t]he power of suspending laws, or the execution of laws, ought never to be exercised, but by the Legislature, or by authority derived from it, to be exercised in such particular cases only as the Legislature shall expressly provide for." Id.; see also Philip Hamburger, Is Administrative Law Unlawful? 529 n.33 (2014) (noting analogous provisions in the early Constitutions of Maryland, Massachusetts, New Hampshire, and North Carolina).

ratification, the Virginia Ratification Convention of 1788 noted the absence of a specific anti-suspension provision in the Philadelphia draft. Some delegates, including Patrick Henry, argued the federal constitution vested too much power in the Presidency. "Your President may easily become king," Henry warned, because if the "American chief be a man of ambition and abilities, how easy is it for him to render himself absolute!" 3 Jonathan Elliot, The Debates in the Several State Conventions of the Adoption of the Federal Constitution 58-69 (1827) (transcribing the oratory of Patrick Henry during the proceedings on June 5, 1788).

For this reason, as well as others, Henry and other delegates voted against the Philadelphia draft. The Convention nonetheless approved the draft by a vote of 89 to 79. See id. at 654-55. Henry's arguments, however, resonated enough with those voting in favor to warrant a specific recommendation by the Convention to the First Congress that the text of Virginia's anti-suspension provision be incorporated verbatim (along with other rights) into a recommended "declaration or bill of rights asserting, and securing from encroachment, the essential and unalienable rights of the people." Id. at 657 (recording the proceedings of June 27, 1788).[13]

Although the First Congress declined to include the anti-suspension provision in the Federal Bill of Rights, Virginia has steadfastly held to the separation-of-powers principle first recognized in its 1776 Virginia Declaration of Rights. The anti-suspension provision has been repeated, without alteration, in all subsequent versions of the Constitution of Virginia. See Va.

---

[13] The ratification conventions in North Carolina and Rhode Island also recommended similar versions of the anti-suspension provision to be included in the post-ratification amendment process that ultimately produced the Bill of Rights to the United States Constitution. See Charles C. Tansill, Documents Illustrative of the Formation of the Union of the American States, H. Doc. No. 398, at 1045, 1053 (1927); Sources of Our Liberties: Documentary Origins of Individual Liberties in the United States Constitution and Bill of Rights 226 (Richard L. Perry ed., 1959).

Const. art. I, § 7 (1830); Va. Const. art. I, § 7 (1851); Va. Const. art. I, § 7 (1864); Va. Const. art. I, § 9 (1870); Va. Const. art. I, § 7 (1902); Va. Const. art. I, § 7 (1971).

The Framers of the Constitution of Virginia of 1776 and the delegates to the Virginia Ratification Convention of 1788 insisted on the anti-suspension provision because of their distrust of concentrated executive power. They held this historic distrust based on the "arbitrary practice" of English Kings before the Glorious Revolution in 1688. Edmund Randolph, Essay on the Revolutionary History of Virginia 1774-1782, in 44 Va. Mag. Hist. & Biography 35, 46 (1936). From the royal perspective, the "dispensing and suspending powers were understood to be absolute. Not merely powers held under law, they developed as sovereign powers outside and above the law." Hamburger, supra note 12, at 65.

The widespread fear of the assertion of absolute executive power led to the adoption of the English Bill of Rights in 1689, which expressly repudiated "the pretended Power of Suspending of Laws or the Execution of Laws by Regall Authority without Consent of Parlyament." The Bill of Rights, 1 W. & M., Sess. 2, ch. 2 (1689).[14] As one historian has explained:

> The reign of James II, and to a lesser extent that of Charles II, provided the historical background of the provisions of the [English] Bill of Rights. One of the most serious grievances which the document sought to correct was the use of the royal prerogative for the purpose of suspending and dispensing with laws. In the past English kings had often exercised without question a rather vague dispensing power, that is, a power of making exceptions to the laws in particular cases. This power was closely related to the power of pardoning offenses against the laws.

---

[14] As many commentators have noted, the Founders "felt themselves the heirs of the Revolution, of the glory derived from 1688. Americans of the 1770s felt they were approaching a 'centennial' of their own, reliving memories of the English Bill of Rights." Garry Wills, Inventing America: Jefferson's Declaration of Independence 64 (2002).

Sources of Our Liberties, supra note 13, at 224; see also Hamburger, supra note 12, at 67-69.

Historically, the regal power to provide individualized favor in particular cases was treated differently than the illegitimate "power of suspending a law so that person in general might treat it as being nonexistent." F.W. Maitland, The Constitutional History of England 302-03 (1919). "The line between the two powers . . . can be theoretically marked — the dispensation applies to this or that individual, a suspending of the statute would free all men, and yet, of course, the dispensing power might be so lavishly used that it would practically operate to suspend the laws." Id. at 304.

After the promulgation of the English Bill of Rights, it became a "maxim in law, that it requires the same strength to dissolve, as to create an obligation," and thus, "the suspending or dispensing with law by regal authority" was considered unlawful. 1 William Blackstone, Commentaries *185-86.[15] Lord Mansfield was just as certain of this maxim: "I can never conceive the prerogative to include a power of any sort to suspend or dispense with laws." 16 The Parliamentary History of England 267 (T.C. Hansard ed., 1813). After all, Mansfield explained, "the duty of [the executive] is to see the execution of the laws" and that "can never be done by dispensing with or suspending them." Id.

In the decade prior to the American Revolution, it thus became commonplace for Englishmen to say confidently that "a suspending power is not, cannot be a legal prerogative, in any circumstances, or under any pretense whatsoever, because the tendency of the exercise of such a prerogative is destructive to the Constitution." Hamburger, supra note 12, at 73 (quoting

---

[15] William Blackstone "constituted the preeminent authority on English law for the founding generation." District of Columbia v. Heller, 554 U.S. 570, 593-94 (2008) (quoting Alden v. Maine, 527 U.S. 706, 715 (1999)). His Commentaries were "heavily" relied upon by the Founders. Akhil Reed Amar, America's Unwritten Constitution: The Precedents and Principles We Live By 7 (2012).

A Speech Against the Suspending and Dispensing Prerogative 24 (6th ed. 1767)). That view was shared by many legal commentators. See 1 Sir William R. Anson, Law and Custom of the Constitution 311-19 (3d ed. 1897) (observing that the King's power to "deviat[e] occasionally from the rigour of a general prohibition," when used without limitation, "amount[ed] to an abrogation" of law); 3 Henry Hallam, The Constitutional History of England 63 (1897) (recognizing that the regal practice of making exceptions to general law "for the sake of conferring a benefit on individuals . . . became intolerable when exercised in contravention of the very principle" inherent in the generally applicable law); Homersham Cox, The Institutions of the English Government 22 (1863) (observing that "the reiterated effect of the dispensing power would be tantamount to an exercise of the suspending power").

There has never been a single, precisely calibrated definition of what constitutes an unlawful executive suspension of laws. It seems clear, however, that two characteristics typically accompany it. The most obvious is when an executive sets aside a generally applicable rule of law based solely upon his disagreement with it. In Virginia such an act would contravene his constitutional "duty to take care that the laws be faithfully executed," Va. Const. art. V, § 7, which presupposes that the executive does not have the option of being unfaithful to laws with which he disagrees. Another characteristic of an unlawful executive suspension is its expansive scope and generality. The more categorical it is, the less likely it will truly represent a permissible deviation from a general rule of law, and thus, the more likely it will result in a suspension of all or part of the disfavored general rule.

In this case, Governor McAuliffe has openly declared his disagreement with the voter-disqualification provision in Article II, Section 1 of the Constitution of Virginia. Although the Governor is entitled to champion his views, he cannot do so in contravention of law. Governor

Kaine had no less of an objection, but he correctly understood that "[a] blanket order restoring the voting rights of everyone would be a rewrite of the law rather than a contemplated use of the executive clemency powers." J.A. at 4. We believe Governor McAuliffe's order has exactly that effect: It seeks not to mitigate the impact of the general voter-disqualification rule of law on an individualized basis but, rather, to supersede it entirely for an indiscriminately configured class of approximately 206,000 convicted felons, without any regard for their individual circumstances and without any specific request by individuals seeking such relief.

4.

We acknowledge the contention that the Governor's Executive Order did not wholly suspend the operation of the voter-disqualification provision. As to convicted felons presently incarcerated in the Commonwealth's penitentiaries, for example, the Governor did not grant the rights to vote, to hold public office, to serve on a jury, and to act as a notary public. Even so, we fail to see why this matters. If, as the Governor asserted, he had "absolute" power in this regard, J.A. at 1, he could have done so. We find no merit in the assertion that a partial violation is no violation at all.

Underlying this all-or-nothing objection is the elusive distinction between the regal power of dispensation and suspension. An English king's power to "dispense" with general law usually took the form of royal "permission given to an individual to disobey a statute." 6 W.S. Holdsworth, A History of English Law 217 (1924). The suspending power was far broader. It had the effect of an "abrogation" of a general rule of law in favor of unnamed individuals within the class affected by the law. Id. "The difference, therefore, between these two powers consists rather in *the extent to which the law is abrogated* than in the quality of the prerogative exercised." Id. (emphasis added).

27

In this case, the general rule of law is clear: "No person who has been convicted of a felony shall be *qualified* to vote." Va. Const. art. II, § 1 (emphasis added). Equally clear is the exception to the general rule: "*unless* his civil rights have been restored by the Governor or other appropriate authority." Id. (emphasis added). Governor McAuliffe's Executive Order has rewritten the provision to invert the rule and the exception. Under his order, no person who has been convicted of a felony shall be *disqualified* to vote *unless* the felon is incarcerated or serving a sentence of supervised release.

This rule-exception inversion may appear subtle to some, but it undermines the very basis for the legitimate use of the executive restoration power. All agree that the Governor can use his clemency powers to mitigate a general rule of law on a case-by-case basis. But that truism does not mean he can effectively rewrite the general rule of law and replace it with a categorical exception. The express power to make exceptions to a general rule of law does not confer an implied power to change the general rule itself. The unprecedented scope, magnitude, and categorical nature of Governor McAuliffe's Executive Order crosses that forbidden line.

We also acknowledge, but reject, the rather bold assertion that the anti-suspension provision has no role to play as a check on *any* of the Governor's clemency powers. See Law Professors Amici Curiae Br. in Support of Respondents at 15-16.[16] The argument begins with the observation that a single pardon issued "on an individual basis" is "in a sense" an executive

---

[16] Justice Powell suggests that amici's assertion "is not bold, but rather, would seem to have been a widely accepted correct statement of Virginia law prior to the majority's decision." Post at 51-52. In support, she cites In re Phillips, 265 Va. 81, 574 S.E.2d 270 (2003). This suggestion appears to imply that In re Phillips recognized amici's "widely accepted" assertion about the irrelevance of the anti-suspension provision. Not so. In re Phillips did not mention (not even in dicta) the anti-suspension provision. Nor did In re Phillips say anything about, much less rule upon, the role the anti-suspension provision plays as a constitutional check on the exercise of executive clemency powers.

act that has the effect of "suspending laws, or the execution of laws." Id. at 15 (citing Lee v. Murphy, 63 Va. (22 Gratt.) 789, 797 (1872)). While this may be accurate in its limited application, it does not support the sweeping proposition that the anti-suspension provision "does not bar *any* exercise of the clemency powers." Id. at 16 (emphasis added).

If the anti-suspension provision has no role to play as a check on any of the Governor's clemency powers, this view, taken to its logical limits, would empower a Virginia Governor to suspend unilaterally the enforcement of any criminal law in the Code of Virginia, based solely on his personal disagreement with it, simply by issuing categorical, absolute pardons to everyone convicted of his disfavored crime. This view would similarly empower a Governor to issue a single, categorical order restoring voting rights to *all* felons — even those imprisoned, those subject to a supervised criminal sentence, and those released from prison but later civilly committed as sexual predators — thereby eliminating any remaining vestige of the general voter-disqualification rule in Article II, Section 1 of the Constitution of Virginia. We find it difficult to believe that either of these hypotheticals would not be viewed as modern examples of the kind of regal excesses condemned by the English Bill of Rights following the Glorious Revolution in 1688. We thus reject the assertion by amici that the anti-suspension provision "does not bar any exercise of the clemency powers." Id. at 16; cf. Hutton v. McCleskey, 200 S.W. 1032, 1033 (Ark. 1918) (applying the anti-suspension provision in the Arkansas Constitution to an executive clemency order that functioned like a "general amnesty" and thus operated as an unconstitutional "suspension of the law").

In sum, Governor McAuliffe's Executive Order has the attributes of an ultra vires assertion of the suspending power that has been forbidden by our Constitution since 1776. Though we exercise our duty of judicial review with great circumspection, we must honor the

axiom that "[i]t is emphatically the province and duty of the judicial department to say what the law is." Marbury, 5 U.S. at 177. Given this responsibility, we declare the Executive Order issued on April 22, 2016, as well as those issued on May 31, 2016, and June 24, 2016, to be in violation of Article I, Section 7 (the anti-suspension provision) and Article II, Section 1 (the voter-disqualification provision) of the Constitution of Virginia.

### D. The Remedy

The ancient common-law writ of mandamus is among our powers of original jurisdiction. Va. Const. art. VI, § 1; see also Code § 8.01-649; Rule 5:7(b). The writ is "an extraordinary remedy employed to compel a public official to perform a purely ministerial duty imposed upon him by law." In re Horan, 271 Va. 258, 258, 634 S.E.2d 675, 676 (2006) (citations omitted). "A ministerial act is an act that one performs in obedience to a legal mandate and in a prescribed manner, without regard to his own judgment as to the propriety of the act to be done." City of Richmond v. Hayes, 212 Va. 428, 429, 184 S.E.2d 784, 785 (1971).[17]

---

[17] We acknowledge that mandamus ordinarily will not issue unless petitioners show they have no adequate remedy at law. An injunction proceeding is not a legal remedy granted by a court of law but rather an equitable remedy issued by a chancery court. See James L. High, A Treatise on Extraordinary Legal Remedies § 20, at 26-27 (3d ed. 1896) (noting "that by a legal remedy, such as will bar relief by mandamus, is meant a remedy at law as distinguished from a remedy in equity"); Horace G. Wood, A Treatise on the Legal Remedies of Mandamus and Prohibition, Habeas Corpus, Certiorari, and Quo Warranto 41 (2d ed. 1891) (explaining that "the fact that a party *may* have relief in a Court of Equity is no reason why the [mandamus] writ should be denied"). This conclusion is logically inescapable given that an injunction generally cannot be issued if the claimant has an adequate remedy at law. See 2 Charles E. Friend & Kent Sinclair, Virginia Pleading & Practice § 33.02[4][b], at 33-49 (2d ed. 2007) ("The party seeking the injunction must also show that he or she has no adequate remedy at law.").

The Solicitor General points out that, pursuant to Code § 24.2-431, petitioners could file multiple law suits in applicable circuit courts seeking an order of cancellation based upon objections "to the registration of any person whose name is on the registration records for their county or city." This statutory cancellation remedy, however, would hardly be adequate enough to displace the need for mandamus relief. A remedy is "adequate" only if it is "equally as

As a result of our holding that the Executive Orders are unconstitutional, no election official in the Commonwealth has the discretion to enforce them. To the contrary, all such officials have a prospective duty to ensure that only qualified voters are registered to vote.[18] We thus order the Secretary of the Commonwealth, the State Board of Elections, the Virginia Department of Elections, and their various employees, agents, chairpersons, and commissioners to take the following actions:

(1) The Department of Elections and Commissioner Edgardo Cortés, on or before August 25, 2016, consistent with his duty to "[r]equire the general registrars to delete from the record of registered voters the name of any voter who . . . has been convicted of a felony," Code § 24.2-404(A)(3), shall cancel the registration of all felons who have been invalidly registered under Executive Orders issued on April 22, 2016, May 31, 2016, and June 24, 2016.

(2) The Department of Elections and Commissioner Cortés, on or before August 25, 2016, shall "[r]equire the general registrars to enter the names of all registered voters into the

_____

convenient, beneficial, and effective as the proceeding by mandamus." Cartwright v. Commonwealth Transp. Comm'r, 270 Va. 58, 64, 613 S.E.2d 449, 452-53 (2005) (quoting Carolina, Clinchfield & Ohio Ry. v. Board of Supervisors, 109 Va. 34, 37, 63 S.E. 412, 413 (1909)). An adequate remedy "must reach the whole mischief, and secure the whole right of the party in a perfect manner, at the present time and in the future." McClaugherty v. McClaugherty, 180 Va. 51, 68, 21 S.E.2d 761, 768 (1942) (citation omitted). Moreover, "[c]onsideration must be given to the urgency that prompts the exercise of the discretion, the public interest and interest of other persons, the results that will occur if the writ is denied, and the promotion of substantial justice." Goldman, 262 Va. at 370-71, 552 S.E.2d at 70-71; see also Gannon v. State Corp. Comm'n, 243 Va. 480, 482, 416 S.E.2d 446, 447 (1992). Given the magnitude, scope, timing, and imprecision of Governor McAuliffe's Executive Order, we find no merit in the assertion that Code §§ 24.2-431 to -433 provides an adequate remedy at law for petitioners' claims.

[18] We have affirmed the appropriateness of the mandamus remedy in election-law cases on appeal, see Wilkins, 205 Va. at 813-14, 139 S.E.2d at 856; Brown, 159 Va. at 47-48, 166 S.E. at 111, as well as in the context of mandamus actions involving what were ultimately held to be unlawful executive acts, see Jackson v. Hodges, 176 Va. 89, 101, 10 S.E.2d 566, 570 (1940); Fugate v. Weston, 156 Va. 107, 120, 157 S.E. 736, 740 (1931).

31

[voter registration] system and to change or correct registration records as necessary," Code § 24.2-404(A)(2), by refusing to register anyone whose political rights have purportedly been restored by Executive Orders issued on April 22, 2016, May 31, 2016, and June 24, 2016, and by canceling the registration of anyone who has registered pursuant to such orders.

(3) The Department of Elections and Commissioner Cortés, on or before August 25, 2016, shall "[r]etain . . . information received regarding . . . felony convictions," Code § 24.2-404(A)(6), by returning to the list of prohibited voters the name of any felon whose political rights have purportedly been restored by Executive Orders issued on April 22, 2016, May 31, 2016, and June 24, 2016.

(4) The State Board of Elections and Chairman James B. Alcorn, Vice Chair Clara Bell Wheeler, and Secretary Singleton B. McAllister, on or before August 25, 2016, "shall institute procedures to ensure that" the Department of Elections and Commissioner Cortés carry out their duties under this Court's order, Code § 24.2-404(C).

(5) Secretary Kelly Thomasson, on or before August 25, 2016, shall maintain and provide to the Department of Elections accurate records of individuals whose political rights have been lawfully restored, by deleting and omitting from the records any felons whose political rights were purportedly restored by Executive Orders issued on April 22, 2016, May 31, 2016, and June 24, 2016. See Code §§ 24.2-404(A)(9), 53.1-231.1.

Writ of Mandamus Issued.[19]

_____

[19] We decline petitioners' request for the issuance of writs of prohibition. Such writs are traditionally issued by "superior courts . . . to the inferior courts, to restrain the latter from excess of jurisdiction." Burch v. Hardwicke, 64 Va. (23 Gratt.) 51, 58 (1873); see also In re Commonwealth's Att'y for Roanoke, 265 Va. 313, 316-17, 576 S.E.2d 458, 461 (2003); Lee v. Jones, 212 Va. 792, 793, 188 S.E.2d 102, 103 (1972). Accordingly, "the writ issues from the superior court, 'directed to the judge and parties of a suit in any inferior court, commanding them

JUSTICE MIMS, dissenting.

Because the Court's holding that Petitioners have standing is not supported by our precedents limiting the extraordinary remedy of mandamus, and because the General Assembly by statute has established the standing requirement and mechanism for challenges to voter registration, I must reluctantly dissent.

I. Standing is Jurisdictional and Fundamental to the Limited Role of the Judiciary

The question of standing can be technical and esoteric. Yet it is fundamental to the proper function of the judiciary. In fact, the doctrine of standing implicates our very jurisdiction and our limited role within our constitutional system. See Nicholas v. Lawrence, 161 Va. 589, 593, 171 S.E. 673, 674 (1933) (explaining that the petitioners had failed to show an injury "peculiar" to themselves and therefore ruling that "this [C]ourt has no jurisdiction to review this case"); see also Warth v. Seldin, 422 U.S. 490, 498 (1975) (observing that the question of standing "is founded in concern about the proper — and properly limited — role of the courts in a democratic society"). We have no authority to reach the merits of a case unless the party seeking to invoke this Court's jurisdiction has satisfied the requirements of standing.

---

to cease from the prosecution thereof, upon the suggestion that [the matter] does not belong to that jurisdiction, but to the cognizance of some other court.'" Burch, 64 Va. at 59 (quoting 3 William Blackstone, Commentaries *112); see also High, supra note 17, § 762, at 705-06 (defining the writ of prohibition as "an extraordinary judicial writ, issuing out of a court of superior jurisdiction and directed to an inferior court, for the purpose of preventing the inferior tribunal from usurping a jurisdiction with which it is not legally vested").

There is no question regarding the importance of this case. Nonetheless, the importance of a case has no role in a court's standing inquiry. The judiciary must not decide cases where the parties do not have standing "however interesting and important to the public [those cases] may be." Nicholas, 161 Va. at 593, 171 S.E. at 674. Rather, courts act to adjudicate particularized legal rights, to resolve disputes that directly affect the legal interests of the parties invoking their jurisdiction. Id. To this end, our standing inquiry must "concern[] itself with the characteristics of the person or entity who files suit" — not the importance of the issues raised. Westlake Props. v. Westlake Pointe Prop. Owners Ass'n, 273 Va. 107, 120, 639 S.E.2d 257, 265 (2007) (internal quotation marks and citation omitted).[1]

The limited role of the judiciary, together with the fundamental constitutional doctrine of separation of powers, counsel that the standing inquiry must be particularly rigorous when a litigant seeks the extraordinary remedy of mandamus, by which courts may compel public officials, and particularly officials in co-equal branches of government, to perform their duties. See Goldman v. Landsidle, 262 Va. 364, 370, 552 S.E.2d 67, 70 (2001); see also Spokeo, Inc. v. Robins, 578 U.S. ___, ___, 136 S.Ct. 1540, 1547 (2016) (noting that federal standing doctrine "confines the federal courts to a properly judicial role"). To that end, this Court has carefully reserved its coercive power of mandamus and established "safeguards" around it. See, e.g., Richmond-Greyhound Lines, Inc. v. Davis, 200 Va. 147, 151, 104 S.E.2d 813, 816 (1958). The standing requirement, being jurisdictional, is the first such safeguard.

_____

[1] The inquiry into "the characteristics of the person," however, must be blind to the status of the litigant in the public arena. In this instance, Speaker Howell and Majority Leader Norment are due great respect and appreciation for their public service. Yet for the purpose of this analysis they stand before the bar of the Court in a different yet equally respected capacity, as citizens and voters.

## II. The Principles from <u>Goldman v. Landsidle</u> Control

This Court has been rigorous in requiring parties to establish standing "to make certain that a party who asserts a particular position has the legal right to do so and that his rights will be affected by the disposition of the case." <u>Goldman</u>, 262 Va. at 371, 552 S.E.2d at 71 (collecting cases). Principles of judicial restraint require courts not to proceed to the merits until a party shows a "particularized injury" to a cognizable personal or property right. <u>See</u> <u>Wilkins v. West</u>, 264 Va. 447, 459, 571 S.E.2d 100, 106 (2002) (describing concept of "injury in fact"); <u>Goldman</u>, 262 Va. at 373, 552 S.E.2d at 72 (noting that a party must show an interest that is "separate and distinct" from that of the public at large to establish standing); <u>Cupp v. Board of Supervisors</u>, 227 Va. 580, 589, 318 S.E.2d 407, 411 (1984) (requiring a "personal stake in the outcome" to "invoke the court's jurisdiction"). Among other reasons, we require litigants to demonstrate a "particularized injury" to a recognized personal or property right to prevent this Court from becoming embroiled in political disputes.

In <u>Goldman</u>, this Court clarified the standing inquiry applicable to "citizen" or "taxpayer" suits seeking mandamus relief against the Commonwealth and its officers. We held that "in the absence of a statutory right, a citizen or taxpayer does not have standing to seek mandamus relief against the Commonwealth unless he can demonstrate a direct interest, pecuniary or otherwise, in the outcome of the controversy that is <u>separate and distinct</u> from the interest of the public at large." 262 Va. at 373, 552 S.E.2d at 72 (emphasis added). The rationale for this rule is twofold. First, a single taxpayer's interest in the Commonwealth's funds is shared with several million persons, and therefore it is "comparatively minute and indeterminable." <u>Id.</u> at 372, 552 S.E.2d at 71 (internal quotation marks and citation omitted). Second, the effect of payments from those funds on the taxpayer's interest is "so remote, fluctuating, and uncertain, that no basis is

35

provided for judicial intervention." Id., 552 S.E.2d at 72.[2]

The caveat "in the absence of a statutory right" found in Goldman should not be dismissed lightly. To acquire the standing necessary to assert a right of action "in the absence of a statutory right," parties must identify a "historically recognized" personal or property right at common law, or a cognizable right arising under the Constitution of Virginia, and allege that such right has been violated in a manner that creates an injury particularized to them. See Cherrie v. Virginia Health Servs., Record No. 151758, slip op. at 4, 292 Va. ___, ___, ___ S.E.2d ___, ___ (July 14, 2016). Otherwise, their interest is not "separate and distinct from the interest of the public at large." Goldman, 262 Va. at 373, 552 S.E.2d at 72. A statute, however, may confer a right and define the prerequisites to standing. In other words, the General Assembly may, by statute, create a right of action and establish standing requirements that are less stringent than the "particularized injury" requirement. See Cherrie, Record No. 151758, slip. op. at 4, 292 Va. at ___, ___ S.E.2d at ___ (explaining that the statutory standing inquiry asks "whether the plaintiff is a member of the class given authority by a statute to bring suit") (internal quotation marks and citation omitted).

The petitioners have not identified any historically recognized common-law right of action to challenge the registration of voters — reinstated or otherwise. See id. Nor can they

---

[2] The majority states that Goldman is a case of taxpayer standing rather than voter standing, and that Wilkins, which was decided subsequently, did not cite Goldman. Both statements are true, but neither is relevant to this analysis. The fundamental principle in Goldman is that citizens seeking mandamus relief against the Commonwealth must show "a direct interest . . . in the outcome of the controversy that is separate and distinct from the interest of the public at large." Goldman, 262 Va. at 373, 552 S.E.2d at 72. Wilkins does not eliminate this requirement for voters; in fact, it also requires a voter to show a "particularized" or "individualized" injury, unless the Court can infer the voter has been subjected to unequal treatment based on his or her residence in an affected district. 264 Va. at 459-60, 571 S.E.2d at 107. In short, the voter must be able to distinguish himself or herself from other voters.

36

rely on a statutory right. The General Assembly long ago created a statutory right of action that permits members of the public to challenge the registration of voters, but that right of action is not broad enough to encompass this action.[3] Likewise, the General Assembly could have expanded standing in the mandamus context post-Goldman. Yet fifteen legislative sessions have come and gone with no such action.

Thus, we must be circumspect with how we exercise our power to find standing, lest we create a right of action that tramples upon the constitutional role of the General Assembly to enact statutes that establish standing requirements. See Concerned Taxpayers v. County of Brunswick, 249 Va. 320, 330 455 S.E.2d 712, 717 (1995) ("When a statute creates a right and provides a remedy for the vindication of that right, then that remedy is exclusive unless the statute says otherwise.") (internal quotation marks, alteration and citations omitted). In other words, it is our duty to ensure the petitioners have alleged a particularized injury to a right protected by the Constitution. Otherwise, we risk creating a judicially-crafted expansion of statutes passed by the General Assembly — "the direct agent and representative of the sovereignty of the people, . . . [and] the natural and necessary repository of power, to be exercised at its discretion for the general good." Willis v. Kalmbach, 109 Va. 475, 492, 64 S.E. 342, 349 (1909).

### III. Wilkins v. West is Inapposite

Relying on Wilkins v. West, 264 Va. 447, 571 S.E.2d 100 (2002), the majority concludes that the petitioners, in their capacity as voters who intend to vote in the 2016 election, should

---

[3] See 1874 Acts ch. 158. Today, Code § 24.2-431 confers standing upon "any three qualified voters" for the purpose of challenging "the registration of any person whose name is on the registration records for their county or city" by filing a petition in circuit court. In so doing, the General Assembly eliminated the need for "any three qualified voters" to demonstrate an injury particularized to them.

37

receive the benefit of an "inference of particularized injury" that vests them with standing to seek mandamus. Supra at 9. But that conclusion does not follow from Wilkins.[4]

In Wilkins, this Court considered the standing requirements necessary to maintain a challenge to redistricting legislation in two contexts: (1) claims that electoral districts were racially gerrymandered, and (2) claims that electoral districts violated the compactness and contiguity requirements of Article II, Section 6 of the Constitution of Virginia. Id. at 459-61, 571 S.E.2d at 106-07. This Court began by reciting the federal standing principles applicable in the context of racial gerrymandering:

> [T]he [United States] Supreme Court concluded that an inference of particularized injury was created for a plaintiff who resides in a racially gerrymandered district because such resident "has been denied equal treatment because of the legislature's reliance on racial criteria . . . ."

Id. at 459, 571 S.E.2d at 107 (quoting United States v. Hays, 515 U.S. 737, 745 (1995)). However, demonstrating the rigor of our traditional standing analysis, we noted that "[a] person who does not live in such a district does not suffer such harm and is not entitled to the inference of harm." Id. at 460, 571 S.E.2d at 107. Rather, that person must "produce[] specific evidence to show individualized injury resulting from racial classification." Id. Thus, we recognized that a person residing in an allegedly racially gerrymandered district has a direct interest in the matter by virtue of his residency in such district, which is "separate and distinct" from residents of a non-gerrymandered district. See Goldman, 262 Va. at 373, 552 S.E.2d at 72. However, a nonresident could only acquire standing by producing specific evidence of an "individualized

---

[4] The parties direct our attention to a number of federal cases, including Michel v. Anderson, 14 F.3d 623 (D.C. Cir. 1994) and Raines v. Byrd, 521 U.S. 811 (1997). However, as the majority correctly notes, Virginia law governs this case. Therefore, following the majority's lead, I confine my analysis to the principles set forth in our precedents.

injury" that renders his interest "separate and distinct" from other nonresidents.

In the same case, this Court applied these same principles in the context of claims that electoral districts violated the compactness and contiguity requirements of Article II, Section 6 of the Constitution of Virginia:

> If a district fails to meet the compactness and contiguous requirements, residents of that district are directly affected by the legislature's failure to comply with the Constitution of Virginia. In the absence of residency in a challenged district, a complainant can establish standing only by showing a particularized injury.

Wilkins, 264 Va. at 460, 571 S.E.2d at 107. Thus, residence in a district challenged on the grounds of compactness and contiguity permits an inference of such injury which is not afforded to residents of unchallenged districts. See id. Again, this is because such injury renders a resident's interest "separate and distinct" from nonresidents, who must produce specific evidence of a particularized injury.

To find that petitioners have standing in their capacity as voters, the majority creates from Wilkins an analogy that is supported by neither precedent nor fact. The analogy between a redistricting map that unconstitutionally "packs" voters into a single district and an executive order that allegedly "pack[ed] approximately 206,000 unqualified voters into the entire Commonwealth," supra at 9, cannot survive scrutiny. To begin, this analogy fails because Wilkins involved a claim that certain districts were racially gerrymandered. Thus, the claim turned on the question of whether residents of those districts had been denied "equal treatment" under the law vis-à-vis residents of other districts due to the improper reliance on racial criteria and thereby were subjected to "special representational harms." Id. at 459-60, 571 S.E.2d at 107

39

(internal quotation marks and citations omitted).[5] The analogy also fails because the concept of "packing" requires a comparison — one voter or class of voters is harmed comparatively rather than absolutely.[6] For example, unconstitutionally drawing a districting map so that certain districts are overpopulated injures residents of those districts by rendering their votes less effective vis-à-vis voters of underpopulated districts. In other words, residents in unconstitutionally overpopulated districts are under-represented by elected officials — a case of clear "representational harm." See Reynolds v. Sims, 377 U.S. 533, 558, 562-63 (1964) (discussing "one person, one vote" principle). Thus, residents of an unconstitutionally overpopulated district have an interest that is "separate and distinct" from residents in other districts. But in the present case, there is only one "district" — the Commonwealth — so the addition of voters impacts each currently registered voter equally: no vote becomes more or less effective relative to another. Accordingly, in a general election, no single voter has an interest in

---

[5] In Wilkins, this Court also applied these principles to the claim arising under Article II, Section 6 of the Constitution of Virginia relating to contiguity and compactness. But only those residents within the allegedly non-compact and non-contiguous districts received the benefit of an inference of representational harm. This is because the Court was able to infer an injury due to the alleged difference between various districts, and the allegedly differential treatment of the residents resulting from the variation between districts. In the present case, the petitioners have not alleged that the Executive Order impacts them differently than it impacts any other citizen of Virginia. Accordingly, we cannot infer an injury here as we could in Wilkins.

[6] The majority takes issue with this statement. However, each Virginia case of alleged voter "packing" has involved a claim that the relevant population was malapportioned such that one district was overpopulated and under-represented relative to other districts. See, e.g., Wilkins v. Davis, 205 Va. 803, 139 S.E.2d 849 (1965); Davis v. Dusch, 205 Va. 676, 139 S.E.2d 25 (1964); Brown v. Saunders, 159 Va. 28, 166 S.E. 105 (1932). A search of federal authority regarding "packing" reveals this general definition from a plurality of the Supreme Court of the United States: "'packing' refers to the practice of filling a district with a supermajority of a given group or party." Vieth v. Jubelirer, 541 U.S. 267, 287 n.7 (2004) (plurality opinion); see also Hunt v. Shaw, 517 U.S. 899, 917 (1996) (describing the right to cast "an undiluted vote," in the context of the Voting Rights Act, as the right "to cast a ballot equal among voters"); Voinovich v. Quilter, 507 U.S. 146, 154 (1993) (describing "packing" as "the concentration of blacks into districts where they constitute an excessive majority").

40

the size of the electorate that is "separate and distinct" from the millions of other voters in the Commonwealth.[7]

The majority concludes that the petitioners have a sufficient interest in the case such that the parties will be "actual adversaries." Supra at 11 (quoting Cupp, 227 Va. at 589, 318 S.E.2d at 411). Yet that alone is insufficient to establish standing in the mandamus context and overrules Goldman sub silentio. The "sufficient interest" requirement from Cupp goes hand in hand with our requirement that the interest be "separate and distinct" from the public at large. See Goldman, 262 Va. at 371-73, 552 S.E.2d at 71-72 (reviewing the principles of standing).

In what way have the petitioners as voters distinguished themselves from the public at

_____

[7] None of the cases cited by the majority that "assume[]" standing are analogous to the one at hand. Supra at 8 n.4. As noted above, each of the cases cited by the majority involved claims that certain districts received disproportionate representation relative to population, thereby rendering the votes of those in packed districts less effective vis-à-vis the votes of registered voters in lesser-populated districts.

In Wilkins, 205 Va. 803, 139 S.E.2d 849, the petitioner was a resident of the then Second Congressional District, which he alleged was overpopulated and under-represented as a result. Brief for the Petitioner at 1-2, id., 205 Va. 803, 139 S.E.2d 849. Although the Court did not discuss the issue of standing, the petitioner's residence gave him an interest "separate and distinct" from that of the public at large in the reapportionment of the district at issue.

Similarly, in Davis, 205 Va. 676, 139 S.E.2d 25, the petitioners were residents of city boroughs that were allegedly under-represented on the basis of population. The petitioners also alleged a statutory right to reapportionment enforceable by mandamus pursuant to former Code §§ 15.1-803 and 15.1-807. Id. at 680-81, 139 S.E.2d at 27-28.

Finally, in Brown, 159 Va. 28, 166 S.E. 105, the petitioner sought a writ of mandamus directing the Secretary of the Commonwealth to place him on the ballot as a candidate at large for a seat in the House of Representatives. The Secretary had refused to recognize his candidacy because such elections were conducted on a district-by-district basis. In response, the petitioner argued that he had satisfied the requirements of former Code § 154 (1930), which set forth the requirements for declaring a candidacy, and that he had a right to contest the election as a candidate at large because the congressional districts were invalid under then Section 55 of the Constitution of Virginia, which required districts to have "as near as practicable an equal number of inhabitants." In short, the petitioner alleged a statutory right to contest the election and sought mandamus to enforce that statutory right. Id. at 31-32, 166 S.E. at 105-06.

41

large?  Is it because they are registered voters and not everyone in the public at large is a registered voter?  But this is no different than suggesting a taxpayer has an interest in how the government allocates funds that is "separate and distinct" from the public at large.  The Court rejected this logic in Goldman and required something more than status as a resident taxpayer to acquire standing.

IV. It is Conceivable that Standing Could be Established upon a More Developed Record

At this time, the petitioners as voters have not shown a representational injury.[8]  They can only generally allege that they are injured per se by the expanded electorate.  This generalized grievance fails to establish an interest that is "separate and distinct" from the public at large.  There are several million voters in the Commonwealth: it follows that an individual's interest in the size of the electorate is "comparatively minute," and attempting to quantify how the individuals with restored voting rights will vote relative to the petitioners is so "uncertain, that no basis is provided for judicial intervention."  Goldman, 262 Va. at 372, 552 S.E.2d at 71-72.  As noted earlier, the General Assembly has the power to grant standing by statute to individuals seeking mandamus against the Commonwealth, but it has declined to do so.  The General Assembly has allowed Goldman to stand, and its principles control this case.

I note, though, that the petitioners' present inability to establish standing under our precedent is not a fault of their own making.  There may be a path by which some or all of the

---

[8] During oral argument, counsel for the petitioners represented to the Court that their primary argument for standing was premised on their status as voters.  However, in their petition, the petitioners have asserted two alternative theories of standing: (1) Senator Norment asserts standing in his capacity as a candidate for re-election in 2019, and (2) Senator Norment and Speaker Howell assert standing in their capacity as members of the General Assembly.  The theory of "candidate standing" is based on competitor standing in the market context and standing derived from procedural injuries in the administrative context.  However, the petitioners have not yet been able to provide evidence, including facts indicating that the addition of voters will impact Senator Norment's re-election campaign.

petitioners can obtain standing, which would permit this Court to properly consider the important constitutional questions presented. In mandamus proceedings, the Court has provided a mechanism for taking evidence as needed. See Rule 5:7(d) ("If this Court or the designated Justice determines that evidence is desirable, depositions shall be taken . . . ."). Upon an amended petition, this mechanism could be initiated and completed on an expedited basis, including entry of an order requiring that the full database of individuals with restored voting rights be provided prior to the taking of such deposition.[9] At this point, I cannot foreclose the possibility that the petitioners could then produce satisfactory evidence of standing. But our limited role within our constitutional system does not allow us to consider these possibilities in the abstract on the virtually non-existent record before us.

Accordingly, I would defer a decision in this matter to allow the parties to take evidence regarding the potential impact of the Executive Order on an expedited basis, should they so choose, and thereafter provide further briefing on the question of standing.

JUSTICE POWELL, with whom JUSTICE GOODWYN joins, dissenting.

I agree with the majority that the dominant role in the articulation of public policy in the Commonwealth rests with the elected branches. I also agree that our role is not to judge the desirability or the wisdom of policy choices. Finally, I agree that our proper role is to interpret the law. I would further add that, in the present case, our role is limited to interpreting the law with regard to Governor McAuliffe's April 22, 2016 Executive Order as written and the subsequent similar orders that are now before us.

---

[9] To date, the petitioners have been unable to gather potentially relevant information regarding the individuals whose voting rights have been restored because the Governor has refused to provide the database. This obstacle cannot stand in the face of a Rule 5:7(d) order.

It is in consideration of this role that I respectfully disagree with the majority's issuance of a writ of mandamus. Specifically, I disagree with the majority's conclusions (1) that petitioners have standing to seek mandamus and prohibition relief; (2) that the Executive Order was unconstitutional and constituted "an unlawful executive suspension of laws" in contravention of Article I, section 7 of the Constitution of Virginia; and (3) ordering all election officials to ignore the Executive Order and rescind any voter rights restored as a result of the Executive Order.

## I. Standing

"The point of standing is to ensure that the person who asserts a position has a substantial legal right to do so and that his rights will be affected by the disposition of the case." Cupp v. Board of Supervisors of Fairfax County, 227 Va. 580, 589, 318 S.E.2d 407, 411 (1984). "[I]t is not sufficient that the sole interest of [a] petitioner is to advance some perceived public right or to redress some anticipated public injury when the only wrong he has suffered is in common with other persons similarly situated." Virginia Beach Beautification Comm'n v. Board of Zoning Appeals, 231 Va. 415, 419, 344 S.E.2d 899, 902 (1986). Thus, it is incumbent on the petitioners to identify either "a statutory right" or a "direct interest, pecuniary or otherwise, in the outcome of the controversy that is separate and distinct from the interest of the public at large." Goldman v. Landsidle, 262 Va. 364, 373, 552 S.E.2d 67, 72 (2001).

The majority bases its ruling on its interpretation of this Court's holding in Wilkins v. West, 264 Va. 447, 571 S.E.2d 100 (2002). According to the majority, Wilkins stands for the proposition that "an individual's residency in an [unconstitutionally configured] district is sufficient to confer standing to challenge non-compliance with a constitutional provision in 'the voting context,' without 'further proof of a personalized injury.'" I disagree with the breadth of

44

the majority's interpretation of Wilkins.

The litigation in Wilkins was initiated by voters who claimed that House and Senate districts were "'designed with the avowed, race-based goal of maximizing the number of minority voters' in violation of Article I, Sections 1 and 11 of the Constitution of Virginia." Id. at 456, 571 S.E.2d at 104. In ruling that the voters had standing to bring the action, this Court expressly adopted "the standing principles enunciated by the Supreme Court in United States v. Hays, 515 U.S. 737 (1995)." Id. at 459, 571 S.E.2d at 106. Thus, contrary to the majority's ruling, this Court has recognized that, in cases challenging non-compliance with a constitutional provision in the voting context, both Virginia law and federal law govern. Furthermore, "the same standard is appropriate to establish standing for allegations that electoral districts violate the compactness and contiguous requirements of Article II, Section 6 of the Constitution of Virginia." Id. at 460, 571 S.E.2d at 107.

Under federal standing principles,

> standing requires the plaintiff to show that he or she has suffered an injury in fact - an invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical.

Id. at 459, 571 S.E.2d at 106 (citation and internal quotation marks omitted).

In addition to adopting the injury in fact requirement, the Court in Wilkins expressly rejected the proposition that "any citizen of a state would have standing to challenge a redistricting statute on an equal protection claim regardless of whether such citizen was personally denied equal treatment." Id. at 459, 571 S.E.2d at 106-07. Absent such a requirement, an individual "would be asserting only a generalized grievance against governmental conduct of which he or she does not approve." Id. at 460, 571 S.E.2d at 107. In other words, we explicitly held that proof of a personalized injury is required to confer standing

45

to challenge non-compliance with a constitutional provision in the voting context.

The majority, however, takes the position that Wilkins stands for the notion that residency in an allegedly unconstitutional district, without anything more, is sufficient to confer standing without any showing of an injury in fact. Such an interpretation removes the context of our holding in Wilkins. Relying on the United States Supreme Court's holding in Hays, we explained that, due to the insidious nature of racial gerrymandering, "demonstration of a particularized injury . . . may be difficult." Id. at 459, 571 S.E.2d at 107. Accordingly,

> an inference of particularized injury was created for a plaintiff who resides in a racially gerrymandered district because such resident "has been denied equal treatment because of the legislature's reliance on racial criteria . . . ." This inference vests the resident of the district with standing . . . to challenge the use of racial classification in creating that district."

Id. at 459-60, 571 S.E.2d at 107 (quoting Hays, 515 U.S. at 745) (emphasis added).

Thus, under Wilkins, residency, without more, only confers standing in one particular situation: where the claim is based on racial gerrymandering. In the absence of such a claim, a plaintiff must demonstrate an injury in fact in order to have standing. "'Unless such evidence is present, that plaintiff would be asserting only a generalized grievance against governmental conduct of which he or she does not approve.'" Id. at 460, 571 S.E.2d at 107 (quoting Hays, 515 U.S. at 745).

Here, petitioners have failed to make any showing of injury in fact. Rather, they merely claim that they, along with every other voter in the Commonwealth, have had their voting rights diluted. Such an injury could hardly be considered personal. Thus, petitioners' claim seeks to "[m]erely advanc[e] a public right or redress[] a public injury," which we have expressly stated "cannot confer standing on a complainant." Id. at 458, 571 S.E.2d at 106 (citing Virginia Beach Beautification Comm'n, 231 Va. at 419, 344 S.E.2d at 902).

46

Indeed, the petitioners' vague voter dilution argument fails to point to any concrete evidence showing that their votes will be diluted. "As the Framers of the Constitution and the Fourteenth Amendment comprehended, representatives serve all residents, not just those eligible or registered to vote." Evenwel v. Abbott, 578 U.S. ___, ___, 136 S.Ct. 1120, 1132 (2016). The Supreme Court has "recognized that the one-person, one-vote rule is designed to facilitate '[f]air and effective representation,' and evaluated compliance with the rule based on total population alone." Id. (quoting Gaffney v. Cummings, 412 U.S. 735, 748, 750 (1973)). "By ensuring that each representative is subject to requests and suggestions from the same number of constituents, total-population apportionment promotes equitable and effective representation." Id. In the context of this case, the reinstated voters would already be counted in the population total for their respective districts, thus there is no reason petitioners' votes would be diluted or could be diluted. See Reynolds v. Sims, 377 U.S. 533, 568 (1964) ("[A]n individual's right to vote for State legislators is unconstitutionally impaired when its weight is in a substantial fashion diluted when compared with votes of citizens living in other parts of the State."); Gray v. Sanders, 372 U.S. 368, 379-80 (1963) ("The concept of 'we the people' under the Constitution visualizes no preferred class of voters but equality among those who meet the basic qualifications.").[1]

---

[1] Though the majority does not decide whether Speaker Howell and Senator Norment have standing as legislators, I note that neither of them would have standing as legislators to challenge Governor McAuliffe's executive order. See Raines v. Byrd, 521 U.S. 811, 829 (1997) ("[A]ppellees have alleged no injury to themselves as individuals . . . , the institutional injury they allege is wholly abstract and widely dispersed . . . , and their attempt to litigate this dispute at this time and in this form is contrary to historical experience. We attach some importance to the fact that appellees have not been authorized to represent their respective Houses of Congress in this action, and indeed both Houses actively oppose their suit.").

The majority also does not determine whether Senator Norment has standing as a 2019 legislative candidate. As a potential future candidate, Senator Norment has alleged no competitive injuries and only a "remote or indirect interest" in the electorate. Thus, he does not

Furthermore, the petitioners have not identified, nor can they identify, a "statute that gives them a legally enforceable right to have the Court compel" the Governor to not issue executive orders that restore voting rights to groups of felons who have served their sentences. Goldman, 262 Va. at 374, 552 S.E.2d at 73. The only statutes available to petitioners which allow them to challenge the restored voters, defeat their argument that they are without an adequate remedy at law to right the perceived wrong against them. Code §§ 24.2-431 through -433 provide a procedure for voters to challenge the lawfulness of another voter's registration. The majority states, in a footnote, that this remedy is not adequate "[g]iven the magnitude, scope, timing, and imprecision of Governor McAuliffe's Executive Order." Assuming the majority is correct and the remedy available under Code §§ 24.2-431 thru -433 is inadequate, the petitioners still would not have standing to seek mandamus. To have standing to pursue a writ of mandamus, a petitioner must present "such a state of facts . . . as to show that the petitioner has a clear right to the performance of the thing demanded, and that a corresponding duty rests upon the officer to perform that particular thing." Milliner v. Harrison, 73 Va. (32 Gratt.) 422, 426 (1879). However, as discussed below, because Governor McAuliffe's actions were not unconstitutional, petitioners do not have a clear right to the issuance of a writ of mandamus.

## II. Constitutionality of the Executive Order

### A. The Executive Order Did Not Violate the Suspension Clause

---

have standing to challenge the executive order. Nicholas v. Lawrence, 161 Va. 589, 593, 171 S.E.2d 673, 674 (1933); see also Wittman v. Personhuballah, 578 U.S. ___, ___, 136 S.Ct. 1732, 1737 (2016) (incumbent legislators only alleged a "nonobvious harm," that their chances at reelection were hindered, which was insufficient to confer standing in their challenge of the redistricting plan).

48

In concluding that the Executive Order violates the Suspension Clause,[2] Article I, Section 7 of the Constitution of Virginia, the majority ignores the plain language of that section and of the Disenfranchisement Clause, Article II, Section 1, and the Restoration Clause, Article V, Section 12, which clearly contemplate that the Governor has the authority to "remove political disabilities consequent upon conviction." Not only is the majority opinion, with respect to the purported violation of the Suspension Clause, not supported by the plain language of the Constitution of Virginia, but it is also decided in a manner that is contrary to established Virginia jurisprudence.

To the extent one could view the Governor's action in restoring political disabilities as a suspension of law, the Governor would be "suspending" the law each time he removed a person's political disabilities, whether he did so on an individual basis or by categorical order. But by approving the Disenfranchisement Clause of the Constitution and by giving the Governor executive clemency powers in the Restoration Clause, the people of the Commonwealth have given their consent to the Governor's suspension of the law within the limitations set out in the Restoration Clause. Virginia Governors have been exercising this authority for over two hundred years and there is no dispute that a governor's exercise of such clemency power on an individual basis does not violate the Suspension Clause.

The merits of this case do not concern the issue of whether the Governor has done something he has no right to do, but rather whether he has done what he has a right to do in an unconstitutional manner. Indeed, it is particularly telling that the majority does not dispute the fact that the Governor may remove an individual felon's political disabilities for any reason he

---

[2] Article I, Section 7 is referred to as "the suspension clause" in the petitioners' briefs and I will refer to it likewise. (Petitioners' Br. at 32).

chooses, including that he has served his sentence. Moreover, the majority acknowledges that the Governor could use many individual orders to achieve the mass restoration of rights he sought to accomplish under the Executive Order. Thus, the majority, in essence, takes the position that the Suspension Clause requires the Governor to exercise his executive powers in a different, less efficient manner.[3]

"In construing constitutional provisions, the Court is 'not permitted to speculate on what the framers of [a] section might have meant to say, but are, of necessity, controlled by what they did say.'" Blount v. Clarke, 291 Va. 198, 205, 782 S.E.2d 152, 155 (2016) (quoting Harrison v. Day, 200 Va. 439, 448, 106 S.E.2d 636, 644 (1959)). "If there are 'no doubtful or ambiguous words or terms used, we are limited to the language of the section itself and are not at liberty to search for meaning, intent or purpose beyond the instrument.'" Id. (quoting Harrison, 200 Va. at 448, 106 S.E.2d at 644).

> "Constitutions are not esoteric documents and recondite learning ought to be unnecessary when we come to interpret provisions apparently plain. They speak for the people in convention assembled, and must be obeyed.
>
> It is a general rule that the words of a Constitution are to be understood in the sense in which they are popularly employed, unless the context or the very nature of the subject indicates otherwise."

Id. (quoting Lipscomb v. Nuckols, 161 Va. 936, 945, 172 S.E. 886, 889 (1934)).

The Suspension Clause states "[t]hat all power of suspending laws, or the execution of

_____

[3] In a somewhat related context, this Court has declined to impose restrictions on the Governor's power where none exist. See Blair, 66 Va. (25 Gratt.) at 861-62 (holding Governor could grant a pre-sentencing pardon and relying in part on the rationale that there was no practical difference between a pre-sentencing and post-sentencing pardon); see also Lee v. Murphy, 63 Va. (22 Gratt.) 789, 797 (1872) (holding the Governor's power to grant pardons, which was not otherwise restricted by the Constitution of Virginia, included the power to grant conditional pardons).

laws, by any authority, without consent of the representatives of the people, is injurious to their rights, and ought not to be exercised." Va. Const. art. I, § 7. The relevant provision from the Disenfranchisement Clause states, "No person who has been convicted of a felony shall be qualified to vote unless his civil rights have been restored by the Governor or other appropriate authority." Va. Const. art. II, § 1. The Restoration Clause states, in relevant part, that the Governor shall have the power "to remove political disabilities consequent upon conviction." Va. Const. art. V, § 12. Notably, the Suspension Clause does not expressly mention the clemency power, nor does it place any unstated restrictions on the Governor's clemency powers. Further, the Suspension Clause does not differentiate between individual or categorical exercises of the clemency power.

Even if one were to suppose a tension existed between the Suspension Clause and the Restoration Clause, such tension could be relieved by the recognized rules of statutory construction. This Court has explained that "provisions of the Constitution should be construed together whenever possible," Miller v. Ayers, 213 Va. 251, 267, 191 S.E.2d 261, 273 (1972), and interpreted to avoid "a strained construction of the language used." Lipscomb, 161 Va. at 949, 172 S.E. at 891

Moreover, we have long recognized that "the specific provision must govern over the general provision." Miller, 213 Va. at 267, 191 S.E.2d at 273 (1972) (citing Pierce v. Dennis, 205 Va. 478, 138 S.E.2d 6 (1964)). Here, the Restoration Clause specifically grants the Governor the power to restore voting rights to convicted felons, whereas the Suspension Clause provides a general limitation on the Governor's power to suspend the law. As the more specific provision, it is clear that the Restoration Clause must govern. Thus, when these canons of statutory construction are all applied to the provisions at issue in the present case, it is readily

51

apparent that, by approving the Disenfranchisement Clause and granting the Governor clemency powers in the Restoration Clause, the people have expressly consented to the Governor's authority to restore voting rights to felons. The assertion that the Suspension Clause plays no role as a check on a Governor's clemency power as specifically granted by the Constitution of Virginia (see Law Professors' Amici Curiae Brief in Support of Respondents) is not bold, but rather, would seem to have been a widely accepted correct statement of Virginia law prior to the majority's decision. See, e.g., In re Phillips, 265 Va. 81, 88, 574 S.E.2d 270, 273 (2003) (recognizing that the power to restore political disabilities is vested solely in the Governor to such a degree that "there is no right of appeal for the Governor's decision").

The purpose of the Suspension Clause as revealed by its history and language is to prevent ultra vires acts undertaken without authority which result in the suspension of the law. It is not to correct wrongful use of authority granted by the Constitution of Virginia or to control the manner in which that constitutional power is properly used. In my opinion, the majority misconstrues the proper function of the Suspension Clause and improperly defines what suspension means.

> At the outset it will be as well to define the term[] "suspend" . . . . The . . . term is generally applied to the abrogation of a statute or statutes, so that they lose altogether their binding force – the Declaration of Indulgence is the best illustration of the exercise of this power. . . . [T]he law is put out of action; . . . it is in substance repealed . . . . [T]here is a wide difference between [this] power[] and the power to pardon. [Suspension] affect[s] the legality of the act done. [It] make[s] legal what would otherwise be illegal. A pardon does not affect the legality of the act. It simply frees a guilty person from the legal consequences of his illegal acts.

6 W.S. Holdsworth, A History of English Law 217-18 (1924). Thus, the Suspension Clause is only relevant when the act is not based on, or exceeds, a grant of constitutional authority. In this instance, the Suspension Clause is only relevant if the Executive Order's categorical grant of

restoration of rights exceeded the constitutional authority granted to the Governor by the Restoration Clause.

The relevant voter qualification provision in Disenfranchisement Clause states that "[n]o person who has been convicted of a felony shall be qualified to vote unless his civil rights have been restored by the Governor or other appropriate authority." Va. Const. art. II, § 1. The Executive Order issued by the Governor states in relevant part that it orders

> the removal of the political disabilities consequent upon conviction of a felony . . . from all those individuals who have, as of this 22nd day of April 2016, (1) completed their sentences of incarceration for any and all felony convictions; and (2) completed their sentences of supervised release, including probation and parole, for any and all felony convictions.

A plain reading of the language in Article II, Section 1 and the Executive Order indicates conclusively that the Executive Order does not abrogate the operation of the Disenfranchisement Clause such that it loses altogether its binding force. Therefore, the Executive Order does not violate the Suspension Clause.

Despite these long-espoused standards of construction, the majority reads the constitutional text in a manner that promotes form over substance to create a logically inconsistent limitation on the Governor's authority. Indeed, rather than confining itself to an examination of the plain language of the Constitution of Virginia and the Executive Order to discern whether the Executive Order violates the Suspension Clause, the majority announces an innovative "rule-exception sequence" inversion theory. That theory purportedly allows the majority to speculate as to the effect of the language in the Executive Order and potential future executive orders and assume that such effect de facto changes the language of the Constitution. This new approach, in essence, allows a court to pick and choose what parts of the Constitution it is going to enforce, by ignoring parts of the Constitution it interprets to be "exceptions." In

53

applying this new theory of constitutional interpretation, for which the majority cites no precedential authority, and for which I cannot find any support, from any jurisdiction, the majority does not concern itself with whether there was an actual suspension of any particular provision as written, but rather whether there was the suspension of a "general principle" of law.

Notably, in applying its new theory, the majority fails to consider the entirety of the constitutional provision it claims was suspended by the Governor's actions. The majority claims that the Executive Order had the effect of suspending the portion of the Disenfranchisement Clause that states "[n]o person who has been convicted of a felony shall be qualified to vote." Va. Const. art. II, § 1. By taking this new approach, the majority ignores the fact that the clause contains an express exception: "[n]o person who has been convicted of a felony shall be qualified to vote <u>unless his rights have been restored by the Governor</u>." <u>Id.</u> (emphasis added). In other words, in holding that the Executive Order suspends the Disenfranchisement Clause, the majority ignores the fact that, to the extent that it is a suspension, the language of our Constitution expressly allows for such suspension.

It is particularly concerning that this new theory does not require a court to look at the actual language of a supposedly suspended law in deciding if an Executive Order suspends it. Instead, a court can consider a general rule of law and ignore what it terms as constitutional "exceptions" in determining if a law has been suspended, notwithstanding the fact that these "exceptions" are just as much a part of the will of the people as are the general rules of law. Indeed, taking the majority's theory to its logical conclusion would, in effect, negate several express powers granted in the Constitution and in statutes, as they could be viewed as "exceptions" that result in the suspension of general rules of law.

54

Furthermore, the application of the "rule-exception sequence" inversion theory crumbles under its own weight in its struggle to justify the majority's conclusion that the Executive Order violates the Suspension Clause. Even considering only the general rule of law created by the majority, the Executive Order, as a factual matter, does not reframe the Disenfranchisement Clause to say, "No person who has been convicted of a felony shall be <u>disqualified</u> to vote <u>unless</u> the convicted felon is incarcerated or serving a sentence of supervised release." (Emphasis in original.) The terms of the Executive Order are not prospective and do not prevent any felon from being disqualified from voting upon conviction. Rather, the Executive Order only restored the rights of a subset of felons, namely, those individuals previously convicted of a felony who, as of April 22, 2016, were no longer incarcerated or on supervised probation, which is approximately 206,000 of the over 450,000 felons eligible to be considered for restoration.[4]

Moreover, felons whose rights were not restored by the Executive Order, as well as newly convicted felons, continue to be disqualified upon conviction unless the Governor or other appropriate authority acts to restore their rights. Indeed, if the Executive Order was, in fact, a suspension of the Disenfranchisement Clause, there would be no need for the Governor to enter subsequent orders restoring the rights of additional felons. When Governor McAuliffe's term is over, the new governor will have the discretion to decide whether to restore the rights of subsequent felons disqualified from voting upon conviction as required by the Disenfranchisement Clause. Thus, it is apparent that the Executive Order clearly did not actually reframe the Disenfranchisement Clause as asserted by the majority, nor does it suspend operation

---

[4] <u>See</u> Respondent's Br. p. 4 (citing Christopher Uggen, Sarah Shannon, & Jeff Manza,State-Level Estimates of Felon Disenfranchisement in the United States 2010, available at https://www.kftc.org/sites/default/files/docs/resources/fd_state_level_estimates_of_felon_ disen_2010.pdf (last visited July 21, 2016) (report for the Sentencing Project, a national non-profit organization engaged in research and advocacy on criminal justice issues)).

55

of that constitutional provision.

### B. The Disenfranchisement Clause and the Restoration Clause Control

In my opinion, the Disenfranchisement Clause and the Restoration Clause are unambiguous and should control in this case. See Blount, 291 Va. at 205, 782 S.E.2d at 155 (determining that the Restoration Clause is "unambiguous"). As we have repeatedly stated, "the plain, obvious, and rational meaning of a statute is to be preferred over any curious, narrow, or strained construction, and a statute should never be construed in a way that leads to absurd results." Ricks v. Commonwealth, 290 Va. 470, 477, 778 S.E.2d 332, 335 (2015) (citation, alteration and internal quotation marks omitted).

Despite the majority's extensive discussion of the fact that no prior governor previously entered a categorical order regarding the restoration of political disabilities consequent upon conviction, the practice of prior governors is not dispositive of the Governor's constitutional authority, or lack thereof, to issue such an order. Indeed, this Court was recently faced with a similar long-running historical practice in Blount. There we explained that the fact that, for 143 years, governors of Virginia had regularly issued "commutations" of non-capital offenses was not evidence of the governor's power to issue commutations because "the question . . . is not one of practice . . . rather it is one of constitutional interpretation." 291 Va. at 210, 782 S.E.2d at 158. The same holds true in the present case. Furthermore, where there are no limits on a power elsewhere in the Constitution, that power cannot be lost "because of misuse." See Bowsher v. Synar, 478 U.S. 714, 727 n.5 (1986). Thus, the proper focus of this Court's analysis should be on interpretation of the Constitution of Virginia, regardless of how the Governor's power to restore political disabilities may have been exercised in the past.

56

"[W]hen an act is adopted in the manner prescribed by and pursuant to the authority of a specifically drawn section of the Constitution, its validity is unassailable upon the grounds of unconstitutionality under the more general provisions of other sections of the Constitution." Miller, 213 Va. at 267, 191 S.E.2d at 273. Under the Restoration Clause, some of the Governor's executive powers of clemency are expressly limited. For example, the Governor is only permitted to remit fines and penalties "under such rules and regulations as may be prescribed by law." Va. Const. art. V, § 12. The Governor only has the power to grant reprieves and pardons "after conviction." Id. Also, the Governor cannot grant reprieves and pardons "when the prosecution has been carried on by the House of Delegates." Id. Obviously, the framers of the Constitution clearly knew how to limit the Governor's clemency powers, and they did so within the relevant clauses of this section. Tellingly, the Constitution is silent with regard to limitations on the Governor's power "to remove political disabilities consequent upon conviction," and certainly the Constitution includes no words of limitation with regard to the manner in which the Governor might exercise that power, whether it be on an individual basis or a categorical one.

The second paragraph of the Restoration Clause reinforces the absence of any prohibition on the Governor removing political disabilities in a blanket order. That paragraph imposes a reporting obligation on the Governor with respect to certain clemency powers. The Governor is required to communicate to the General Assembly, at each regular session, the "particulars of every case of fine or penalty remitted, of reprieve or pardon granted, and of punishment commuted," with his reasons for doing so. Id. No such reporting requirement is imposed on the Governor with respect to his power to remove political disabilities. Thus, even if this second paragraph could be read to imply that the Governor could only exercise his clemency powers in

57

individualized orders as opposed to blanket orders, this potential limitation does not apply to the Governor's power to remove political disabilities. As we have previously held, the power to remove political disabilities for convicted felons "remains vested solely in the Governor, who may grant or deny any request without explanation, and there is no right of appeal from the Governor's decision." In re Phillips, 265 Va. at 87-88, 574 S.E.2d at 273.

I believe that the majority's consideration of the textual inferences to be drawn from the Restoration Clause is flawed, because it fails to adequately consider the history of the clemency provisions which concern the restoration of political disabilities by the Governor. A more complete consideration of that history indicates that, despite Virginia's historical distrust of executive power, its citizens purposefully granted the Governor textually unrestricted constitutional authority to remove political disabilities consequent upon conviction, perhaps in consideration of the potential disenfranchisement and exclusion from government of former Confederates.[5] However, the reason why they did it is irrelevant, the will of the people as expressed in the text of the Constitution of Virginia should be enforced.

---

[5] As noted by the majority, the Constitution of Virginia initially circumscribed the clemency power of the Governor. In 1776, the Constitution of Virginia required the Governor to first consult with the Council of State before issuing a pardon and forbade any executive pardon contrary to laws enacted by the legislature. Va. Const. § 9 (1776). The Constitution of Virginia later imposed a reporting requirement. See Va. Const. art. V, § 12.

However, ratification of the 1870 Constitution occasioned significant and enduring reorientation of the Governor's constitutional clemency powers. The drafters of the 1870 Constitution began crafting that document in December 1867. (Only the debates of the Constitutional Convention between December 3, 1867 and January 29, 1868 were recorded "verbatim" in "The Debates and Proceedings of the Constitutional Convention of the State of Virginia" ("Convention Debates"), available at http://hdl.handle.net/2027/hvd.li14pl (last visited July 22, 2016). A less detailed account of the entire convention is available in a "Journal of the Constitutional Convention of the State of Virginia" ("Convention Journal"), available at http://hdl.handle.net/2027/umn.319510024615024 (last visited July 22, 2016). Documents the delegates chose to print are compiled in "Documents of the Constitutional Convention of the

58

State of Virginia" ("Convention Documents"), available at http://hdl.handle.net/2027/hvd.li14pj (last visited July 22, 2016). Each is available at https://www.hathitrust.org/.) Under the governance of the Reconstruction Act of 1867, the constitutional convention lasted approximately four months, and among the chief concerns was the political participation of African-Americans and the potential disenfranchisement and exclusion from government of former Confederates. See 1 A.E. Dick Howard, Commentaries on the Constitution of Virginia 329 (1974); see also John Dinan, The Virginia State Constitution: A Reference Guide 13 (G. Alan Tarr ed., 2006) (explaining the sharp disagreement over the role African-Americans were to play in post-Civil War government).

It was questioned relatively early in the debates whether the Governor should have the authority to remove political disabilities from those who receive "executive clemency, when, in [the Governor's] opinion, the facts of the case warrant such a course." See Convention Documents at 129 (January 16, 1868 Report of The Committee on the Pardoning Power). Although the Committee on the Pardoning Power recommended against granting the Governor such power because he might abuse it, the issue was tabled on January 17, 1868, without meaningful debate. See id. at 129; Convention Debates at 150, 483-84.

The actual constitutional language defining the Governor's powers was not discussed in earnest and finalized until the debates of February 3, 1868 through February 9, 1868. See Convention Journal at 139-69. When the Committee on the Executive Department of Government submitted its recommendations for the portion of the Constitution of Virginia defining the Governor's clemency powers, it proposed retaining legislative control over the granting of reprieves and pardons and did not mention a separate power to remove political disabilities. See Convention Documents at 141-44; Convention Journal at 102.

However, during debate, a delegate recommended the Governor have the power "to remove political disabilities consequent upon conviction." See Convention Journal at 146. Interestingly, this language was proposed by the same delegate, Edgar Allan, who requested the Committee on the Pardoning Power report on whether the Governor should have the power to remove political disabilities. See Convention Debates at 150. After discussing the matter, another delegate suggested seemingly broader language that the Governor "have the power . . . to remove political disabilities consequent upon conviction for offenses committed prior, or subsequent to, the adoption of this Constitution." See Convention Journal at 149; see also Ex parte Grossman, 267 U.S. 87, 117 (1925) (explaining that "the term 'offences' is used in the Constitution in a more comprehensive sense than are the terms 'crimes' and 'criminal prosecutions'"). Another delegate then proposed the Constitution of Virginia qualify that "no pardon shall have the effect of removing such disabilities except in cases wherein the party has been, or may be, improperly convicted, or the commission of the offense was attended by strong mitigating circumstances." See Convention Journal at 149. The convention rejected the proffered limit on the effect of a pardon and agreed the Governor should be able to remove political disabilities.

Further expanding the Governor's clemency powers, a delegate then successfully proposed removing language that, in all previous constitutions, had specifically permitted legislative control over the Governor's power to grant reprieves and pardons. See Convention

Documents at 141 (proposing the Governor shall have the power to "grant reprieves and pardons after conviction" except in prosecutions carried out by the House of Delegates "or [when] the law shall otherwise particularly direct"); Convention Journal at 150 (removing "or [when] the law shall otherwise particularly direct"); see also 10 William F. Swindler, Sources & Documents of United States Constitutions Virginia, Washington, West Virginia, Wisconsin, Wyoming 54, 64, 83, 104 (1979) (reprinting the 1776, 1829, 1851, 1864, and 1870 Constitutions); compare Convention Documents at 288 (The Report of The Committee of Revision on the Reports of the Standing Committees, which appears to incorporate amendments to the Standing Committees' initial proposals of constitutional language) with Swindler, supra at 119 (reprinting the 1870 Constitution, which included verbatim language defining the Governor's clemency powers as reported by The Committee of Revision). Accordingly, it appears the convention sought to expand and unleash the Governor's clemency powers, despite being amply warned that the Governor might use those powers categorically or for ill ends. See Blair, 66 Va. (25 Gratt.) at 859-60 (noting the executive pardon power was freed from legislative control in 1870 Constitution and extended to "a new and important subject," the power to remove political disabilities).

It appears the drafters of the 1870 Constitution knew how to limit the Governor's exercise of his restoration power had they intended to do so. See City of Va. Beach v. International Family Entm't, 263 Va. 501, 507, 561 S.E.2d 696, 700 (2002) (noting that, had the General Assembly intended to legislate a certain result, it certainly knew how to do so because it had codified a similar result in other legislation). As noted above, previous constitutional conventions were not shy about explicitly limiting the Governor's clemency powers, and the 1870 Constitution retained some of those limits. Even more telling it seems, the 1870 Constitution as proposed to Virginians for ratification, included two provisions intended to exclude former Confederates from voting and from political office. See Armistead R. Long, The Constitution of Virginia: An Annotated Edition 22-23, 26-27 (1901) (describing the disenfranchisement and "test oath" clauses that were ultimately rejected by Virginia citizens when ratifying the 1870 Constitution). The provisions contained language that, respectively, allowed "the legislature may, by a vote of three-fifths of both houses, remove the political disabilities incurred by this clause from any person included therein by a separate vote in each case" and "[t]he disabilities [here]in contained may be individually removed by a three fifths vote of the general assembly." See id.; Swindler, supra at 117-18. Although Virginians ultimately rejected both provisions, they appear to confirm the drafters understood the difference between restoration of rights en masse and restoration on an individual basis and did not intend to limit the Governor to the latter.

Of note, shortly after ratification of the 1870 Constitution, the U.S. Supreme Court repeatedly determined the President could use his pardon power to forgive groups of individuals. See Knote v. United States, 95 U.S. 149, 152-53 (1877) (explaining that presidential forgiveness operated identically whether extended through individual pardon or amnesty to "whole classes or communities."); United States v. Klein, 80 U.S. 128, 139-42 (1872) (intimating the President did not need statutory authority to grant general pardons or amnesty in the wake of the Civil War); see also Armstrong v. United States, 80 U.S. 154, 155-56 (1972) (implicitly recognizing validity of President Andrew Johnson's December 25, 1868 general pardon). Notwithstanding, the

In the absence of textual limitations specifying the manner in which constitutional powers must be exercised, this Court has recognized that the Governor has broad discretion to exercise his constitutional powers, even if his decisions create arguably undesirable results. See Allen v. Byrd, 151 Va. 21, 25-27, 144 S.E. 469, 470 (1928) (the Governor's power to fill vacancies on this Court temporarily, like his power to remit fines and penalties, is an executive discretionary function that he is not constrained from exercising); Blair v. Commonwealth, 66 Va. (25 Gratt.) 850, 862-63 (1874) ("Is it not reasonable to suppose that the framers of the constitution, while they were enlarging the executive powers of pardon, and freeing it from the control of the legislature, intended to invest the governor with discretion in such a case?").

Petitioners assert that the limitations are found when the Restoration Clause is read in conjunction with the Disenfranchisement Clause. According to Petitioners, because the Disenfranchisement Clause refers to an individual whose rights have been restored, namely as "his," that indicates that restoration of political disabilities can only be restored on an individual basis. This clause, however, has nothing to do with the Governor's clemency powers. Instead, it governs the qualifications necessary for individual voters in Virginia. Under the Disenfranchisement Clause, a person convicted of a felony cannot vote in Virginia unless "his civil rights" have been restored; nothing in this clause indicates that such a restoration can only occur on an individual basis. The Disenfranchisement Clause merely states the requirement imposed on each person who has been convicted of a felony who seeks to become a qualified voter. Indeed, if we were to apply petitioners' interpretation, the Governor would not be able to

wording of the Constitution of Virginia, which does not require that restoration be done on an individual basis, has endured two constitutional conventions since 1870. See Swindler, supra at 161 (providing the 1902 Constitution); Va. Const. art. V, § 12; see also Lewis v. Whittle, 77 Va. 415, 421 (1883) ("[I]t is safer to consider that such words as are used are those intended to be used, and such words as are not used were not intended to be used.").

restore the rights of women or of multiple persons.  Our interpretation of this clause is aided by the long-settled canon of construction that "[i]n the absence if a contrary indication, the masculine includes the feminine (and vice versa) and the singular includes the plural (and vice versa)."  Antonin Scalia & Bryan A. Garner, Reading Law:  The Interpretation of Legal Texts 129 (2012) (App. 250).  See also Code § 1-216 ("A word used in the masculine includes the feminine and neuter."); Code § 1-227 ("A word used in the singular includes the plural and a word used in the plural includes the singular.").

It is further worth noting that individuals in Virginia have previously had their political disabilities restored in categorical orders, as opposed to on an individualized basis, by "other appropriate authorities."  That phrase has been interpreted to include the President of the United States and other governors or pardoning boards with such authority.  These "other appropriate authorities" have restored voting rights or otherwise granted clemency on a class-wide basis.  See Va. Op. Att'y Gen. 99-087, 1999 Va. AG LEXIS 50 (Aug. 3, 1999); Ky. Exec. Order No. 2015-871 (Nov. 24, 2015), available at http://apps.sos.ky.gov/Executive/Journal/ execjournalimages/2015-MISC-2015-0871-242277.pdf (last visited July 21, 2016) (restoring political disabilities to felons), Iowa Exec. Order No. 42 (July 4, 2005), available at http://publications.iowa.gov/3762/1/EO_42.pdf (last visited July 21, 2016) (restoring rights of citizenship to offenders who had completed their sentences).

I believe that the plain language of the Disenfranchisement Clause is unambiguous and places no limitations on the Governor's power to remove political disabilities.  The Disenfranchisement Clause simply requires that, in order to be qualified to vote, a person who has been convicted of a felony must have had his or her civil rights "restored by the Governor or

62

other appropriate authority." This clause in no way dictates the manner in which restoration by the Governor or "other appropriate authority" must occur.

### III. Conclusion

In my opinion the petitioners lack standing in the present case. Furthermore, even if the petitioners were able to demonstrate standing, nothing in the Constitution of Virginia renders the manner in which the Governor exercised his authority in this Executive Order and the subsequent similar orders unconstitutional. In exercising his power to remove political disabilities through the Executive Order and subsequent similar orders, the Governor neither reframed the Disenfranchisement Clause nor suspended its operation. Indeed, the Disenfranchisement Clause does not implicate the manner in which the Governor may exercise his clemency powers under the Restoration Clause. Accordingly, I would hold that the Governor's Executive Order and subsequent similar orders do not violate the Constitution of Virginia and, therefore, I would deny the writs of mandamus and prohibition.